IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:   THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE

| | | |
|---|---|---|
| KISAAN DIE TECH PRIVATE, LTD., *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | Consol. Court No. 21-00512 |
| v. | ) ) | |
| THE UNITED STATES, | ) ) | |
| Defendant. | ) ) | |

## <u>ORDER</u>

Upon consideration of the motions for judgment upon the administrative record filed by plaintiffs, the response thereto, plaintiffs' replies, the administrative record, and all other pertinent papers, it is hereby

ORDERED that plaintiffs' motions are DENIED;

ORDERED that the Department of Commerce's determination is affirmed in all respects; and it is further

ORDERED that judgment is entered in favor of the United States.


Dated: _____, 2022          _____
   New York, N.Y.                                       JUDGE TIMOTHY C. STANCEAU

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:   THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE

| | | |
|---|---|---|
| KISAAN DIE TECH PRIVATE, LTD., *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | Consol. Court No. 21-00512 |
| v. | ) ) | |
| THE UNITED STATES, | ) ) | |
| Defendant. | ) ) | |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

GEOFFREY M. LONG
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington D.C.  20044

OF COUNSEL:

ASHLANDE GELIN
Office of the Chief Counsel
  For Trade Enforcement & Compliance
Department of Commerce

October 14, 2022                    Attorneys for Defendant

## <u>**TABLE OF CONTENTS**</u>

TABLE OF AUTHORITIES ....................................................................................... iii

STATEMENT PURSUANT TO RULE 56.2 ............................................................... 2

    I.     Administrative Determination Under Review .......................................... 2

    II.    Issues Presented For Review ................................................................... 2

STATEMENT OF FACTS ........................................................................................... 2

    I.     Overview Of The First Administrative Review ...................................... 2

    II.    Questionnaire Responses Relating To Window Period Sales ................. 4

    III.   Questionnaire Responses Relating To CONNUM-Specific Costs ......... 6

    IV.   Questionnaire Responses Relating To Other Issues ............................... 8

    V.    Commerce's Preliminary Results ......................................................... 10

          A.    Commerce Uses Facts Otherwise Available ............................ 10

          B.    Commerce Applies An Adverse Inference In Selecting
               From Among Facts Available .................................................... 12

          C.    Rate Selection .......................................................................... 13

          D.    Rate Applied To Non-Examined Companies ........................... 14

    VI.   Commerce's Final Results .................................................................... 15

ARGUMENT .............................................................................................................. 17

    I.     Standard Of Review ............................................................................. 17

    II.    Commerce's Use Of Facts Available With An Adverse Inference
         Is Supported By Substantial Evidence And In Accordance With
         Law ...................................................................................................... 18

          A.    Legal Framework ..................................................................... 18

          B.    Substantial Evidence Supports Commerce's Resort To
               Facts Available ........................................................................ 19

               1.    Chandan Failed To Report Comparison Market
                        Window Sales ............................................................. 20

2.      Chandan Failed To Accurately Report Costs At The CONNUM-Specific Level .............................................................23

3.      Chandan Failed To Correct Other Deficiencies............................29

C.      Commerce's Decision To Apply Total Adverse Facts Available With An Adverse Inference Is Based On Substantial Evidence And In Accordance With Law ...............................30

III.    Commerce's Use Of A Rate From A Prior Segment Of The Proceeding Is Supported By Substantial Evidence And In Accordance With Law ........................................................................34

A.      Legal Framework ..................................................................34

B.      The Selection Of The AFA Rate Is Supported By Substantial Evidence..........................................................34

IV.     Commerce's Decision To Assign Chandan's Dumping Margin As The Rate For Non-Examined Companies Is Supported By Substantial Evidence And In Accordance With Law ..............................36

A.      Legal Framework ..................................................................36

B.      Commerce Lawfully Selected Chandan's Margin As The Rate For  Non-Examined Companies ..............................37

C.      Commerce Has No Substantial Evidence On The Record To Deviate From The Expected Method ...............................43

CONCLUSION............................................................................................45

CERTIFICATE OF COMPLIANCE ..........................................................46

# TABLE OF AUTHORITIES

## CASES

*Albemarle Corp. v. United States*,
821 F. 3d 1345 (Fed. Cir. 2016) .......................................................................... *passim*

*Amanda Foods (Vietnam) Ltd. v. United States*,
647 F. Supp. 2d 1368 (Ct. Int'l Trade 2009) ........................................... 40

*Amanda Foods (Vietnam) Ltd. v. United States*,
807 F. Supp. 2d 1332 (Ct. Int'l Trade 2011) ...................................... 41, 42

*Asahi Seiko Co., Ltd. v. United States*,
755 F. Supp. 2d 1316 (Ct. Int'l Trade 2011) ........................................ 42

*Atl. Sugar, Ltd. v. United States*,
744 F.2d 1556 (Fed. Cir. 1984) ............................................................ 18

*Baroque Timber Indus. (Zhongshan) Co. v. United States*,
971 F. Supp. 2d 1333 (Ct. Int'l Trade 2014) ......................................... 38

*Bebitz Flanges Works Priv. Ltd. v. United States*,
433 F. Supp. 3d 1297 (Ct. Int'l Trade 2020) ......................................... 21

*Bosun Tools Co., Ltd. v. United States*,
2021-1930, 2022 WL 94172 (Fed. Cir. Jan. 10, 2022) ........................... 38

*Calcutta Seafoods Pvt. Ltd. v. United States*,
495 F. Supp. 3d 1318 (Ct. Int'l Trade 2021) ........................................ 32

*Changzhou Hawd Flooring Co. v. United States*,
848 F.3d 1006 (Fed. Cir. 2017) ................................................... 36, 37, 39

*Changzhou Wujin Fine Chemical Factory Co. v. United States*,
701 F.3d 1367 (Fed. Cir. 2012) .......................................................... 39

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966) ............................................................................ 18

*Deacero S.A.P.I. de C.V. v. United States*,
996 F.3d 1283 (Fed. Cir. 2021) .......................................................... 40

*Dorbest Ltd. v. United States*,
604 F.3d 1363 (Fed. Cir. 2010) .......................................................... 34

*DuPont Teijin Films China Ltd. v. United States*,
   7 F. Supp. 3d 1338 (Ct. Int'l Trade 2014) ............................................................... 41

*Fujitsu Gen. Ltd. v. United States*,
   88 F.3d 1034 (Fed. Cir. 1996)..................................................................................... 18

*Godaco Seafood Joint Stock Co. v. United States*,
   494 F. Supp. 3d 1294 (Ct. Int'l Trade 2021) ...................................................... 43, 44

*Hitachi Energy Co., USA, Inc. v. United States*,
   34 F.4th 1375 (Fed. Cir. 2022) .......................................................................... 22, 23

*Hung Vuong Corp. v. United States*,
   No. 19-00055, 2021 WL 4772962 (Ct. Int'l Trade Oct. 12, 2021)............................. 30, 32, 35

*Hyundai Electric & Energy Systems Co., Ltd. v. United States*,
   15 F.4th 1078 (Fed. Cir. 2021) .................................................................................. 31

*Jindal Poly Films v. United States*,
   365 F. Supp. 3d 1379 (Ct. Int'l Trade 2019) ...................................................... 28, 29

*Maverick Tube Corp. v. United States*,
   857 F.3d 1353 (Fed. Cir. 2017)............................................................................ 22, 31

*Mukand, Ltd. v. United States*,
   767 F.3d 1300 (Fed. Cir. 2014).......................................................................... 23, 32

*Navneet Publications (India) Ltd. v. U.S.*,
   999 F. Supp. 2d 1354 (Ct. Int'l Trade 2014) ...................................................... 39, 40

*Nippon Steel Corp. v. United States*,
   458 F.3d 1345 (Fed. Cir. 2006).......................................................................... 18, 19

*Nippon Steel Corp. v. United States*,
   337 F.3d 1373 (Fed. Cir. 2003).......................................................................... 31, 32

*Ozdemir Boru San. Ve Tic. Ltd. v. United States*,
   273 F. Supp. 3d 1225 (Ct. Int'l Trade 2017) ............................................................ 34

*PAM, S.p.A. v. United States*,
   582 F.3d 1336 (Fed. Cir. 2009)............................................................................ 18, 35

*Papierfabrik August Koehler Se v. United States*,
   843 F.3d 1373 (Fed. Cir. 2016)................................................................................. 35

*PrimeSource Bldg. Prod., Inc. v. United States*,
   581 F. Supp. 3d 1331 (Ct. Int'l Trade 2022) ............................................... 37, 38, 43

*Pro-Team Coil Nail Enter., Inc. v. United States*,
   No. 18-00027, 2022 WL 2783885 (Ct. Int'l Trade July 15, 2022) .......................... 39

*Qingdao Qihang Tyre Co. v. United States*,
   308 F. Supp. 3d 1329 (Ct. Int'l Trade 2018) ................................................... 42

*Rhone Poulenc, Inc. v. United States*,
   899 F.2d 1185 (Fed. Cir. 1990) ............................................................... 38, 43

*Schaeffler Italia S.r.l. v. United States*,
   781 F. Supp. 2d 1358 (Ct. Int'l Trade 2011) ................................................ 41, 42

*Shandong Huarong Gen. Corp. v. United States*,
   159 F. Supp. 2d 714 (Ct. Int'l Trade 2001) ...................................................... 18

*Societe Nouvelle De Roulements (SNR) v. United States*,
   910 F. Supp. 689 (Ct. Int'l Trade 1995) ......................................................... 29

*Solianus, Inc. v. United States*,
   391 F. Supp. 3d 1331 (Ct. Int'l Trade 2019) ..................................................... 43

*Ta Chen Stainless Steel Pipe, Inc. v. United States*,
   298 F.3d 1330 (Fed. Cir. 2002) ................................................................... 35

*Union Steel Mfg. Co. v. United States*,
   837 F. Supp. 2d 1307 (Ct. Int'l Trade 2012) ..................................................... 41

*United States v. Eurodif S.A.*,
   555 U.S. 305 (2009) ............................................................................... 18

*Xi'an Metals & Mins. Imp. & Exp. Co. v. United States*,
   520 F. Supp. 3d 1314 (Ct. Int'l Trade 2021) ...................................................... 6

*Xi'an Metals & Mins. Imp. & Exp. Co. v. United States*,
   No. 21-2205, 2022 WL 4391436 (Fed. Cir. Sept. 23, 2022) ................................... 6, 32

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
   716 F.3d 1370 (Fed. Cir. 2013) ................................................................... 40

*YC Rubber Co. v. United States*,
   No. 2021-1489, 2022 WL 3711377 (Fed. Cir. Aug. 29, 2022) .................................. 42

## STATUTES

19 U.S.C. § 1516a(b)(1)(B) .................................................................................. 18

19 U.S.C. § 1673d(c)(5) ................................................................................. 14, 16

19 U.S.C. § 1673d(c)(5)(B) ........................................................................... *passim*

19 U.S.C. § 1677(a)(2)(C) ...................................................................................... 30

19 U.S.C. § 1677b(1) ............................................................................................. 24

19 U.S.C. § 1677e .............................................................................................. 14, 39

19 U.S.C. § 1677e(a) ...................................................................................... *passim*

19 U.S.C. § 1677e(a)(1) ................................................................................. 10, 11

19 U.S.C. § 1677e(a)(2)(A) .................................................................................. 11

19 U.S.C. § 1677e(a)(2)(B) .................................................................................. 10

19 U.S.C. § 1677e(a)(2)(C) ............................................................................. 10, 11

19 U.S.C. § 1677e(b) ................................................................................ 4, 12, 19, 31

19 U.S.C. § 1677e(b)(1) ....................................................................................... 19

19 U.S.C. § 1677e(b)(2) ....................................................................................... 19

19 U.S.C. § 1677e(c)(2) ....................................................................................... 14

19 U.S.C. § 1677e(c)(5)(B) .................................................................................. 14

19 U.S.C. § 1677e(d)(1)(B) ............................................................................. 34, 40

19 U.S.C. § 1677e(d)(2) ................................................................................. 34, 35

19 U.S.C. § 1677e(d)(3) ................................................................................. 39, 40

19 U.S.C. § 1677f-1(c) ......................................................................................... 42

19 U.S.C. § 1677f-1(c)(2) .............................................................................. *passim*

19 U.S.C. § 1677f-1(c)(2)(B) ................................................................................. 3

19 U.S.C. § 1677m.................................................................................................. 28

19 U.S.C. § 1677m(a) ........................................................................................ 3, 41

19 U.S.C. §  1677m(c)(2)....................................................................................... 32

19 U.S.C. § 1677m(i)(1) ........................................................................................ 39

Statement of Administrative Action accompanying the Uruguay Round Agreements Act
    H.R. 103-316 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040................................... 16

## REGULATIONS

19 C.F.R. § 351.204(d) ....................................................................................... 3, 41

19 C.F.R. § 351.308(c)............................................................................................ 19

19 C.F.R. § 351.309(c)(2)....................................................................................... 34

## FEDERAL REGISTER NOTICES

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,*
    84 Fed. Reg. 67,712 (Dep't of Commerce Dec. 11, 2019) ........................................ 2

*Stainless Steel Flanges from India: Antidumping Duty Order,*
    83 Fed. Reg. 50,639 (Dep't of Commerce Oct. 9, 2018)........................................... 2

*Stainless Steel Flanges from India: Preliminary Results of Antidumping Administrative*
    *Review; 2018-2019,* 86 Fed. Reg. 11,231 (Dep't of Commerce Feb. 24, 2021) ...................... 3

*Stainless Steel Flanges From India: Final Results of Antidumping Duty Administrative*
    *Review; 2018-2019,* 86 Fed. Reg. 47,619 (Dep't of Commerce Aug. 26, 2021) ................. 2, 15

## RULES

CIT Rule 56.2.......................................................................................................... 1

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:   THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE

| | |
|---|---|
| KISAAN DIE TECH PRIVATE, LTD., )<br>  *et al.,* )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>THE UNITED STATES, )<br>)<br>Defendant. ) | Consol. Court No. 21-00512 |

**DEFENDANT'S RESPONSE TO PLAINTIFFS'
MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States, respectfully responds to the three motions for judgment upon the agency record filed by the following plaintiffs in these consolidated cases:  (1) Kisaan Die Tech Private Limited (Kisaan) (ECF No. 35); (2) Chandan Steel Limited (Chandan) (ECF No. 37); and (3) Echjay Forgings Private Limited, Hilton Metal Forging Limited, Jai Auto Pvt. Ltd., Goodluck India Limited, Jay Jagdamba Forgings Private Limited, Jay Jagdamba Limited, Jay Jagdamba Profile Private Limited, Shree Jay Jagdamba Flanges Pvt. Ltd., Balkrishna Steel Forge Pvt. Ltd, Pradeep Metals Limited, and Bebitz Flanges Works Private Limited (collectively, the "Other Plaintiffs") (ECF No. 36).

Plaintiffs challenge certain aspects of the Department of Commerce's final results in the 2018-2019 administrative review of the antidumping duty order covering stainless steel flanges from India.  As explained below, Commerce's determinations are supported by substantial evidence and in accordance with law.  The Court therefore should deny the motions and enter judgment for the United States.

**STATEMENT PURSUANT TO RULE 56.2**

**I.      Administrative Determination Under Review**

The administrative determination under review is Commerce's final results in *Stainless Steel Flanges From India: Final Results of Antidumping Duty Administrative Review; 2018-2019*, 86 Fed. Reg. 47,619 (Dep't of Commerce Aug. 26, 2021) (*Final Results*) (P.R. 171), as further discussed in the accompanying Issues and Decision Memorandum (IDM) (P.R. 169). The period of review (POR) is March 28, 2018, through September 30, 2019.

**II.     Issues Presented For Review**

1.      Whether Commerce's decision to use facts available with an adverse inference in determining the dumping margin applicable to Chandan, and to set a dumping margin of 145.25 percent, is supported by substantial evidence and otherwise in accordance with law.

2.      Whether Commerce's decision to apply Chandan's margin to non-examined respondents is supported by substantial evidence and otherwise in accordance with law.

**STATEMENT OF FACTS**

**I.      Overview Of The First Administrative Review**

In 2018, Commerce issued the antidumping (AD) order on stainless steel flanges from India.  *See Stainless Steel Flanges from India: Antidumping Duty Order*, 83 Fed. Reg. 50,639 (Dep't of Commerce Oct. 9, 2018).  On December 11, 2019, Commerce initiated the first administrative review.  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 67,712 (Dep't of Commerce Dec. 11, 2019) (P.R. 20).  In March of 2020, Commerce selected Chandan as the sole mandatory respondent for the review and issued an initial antidumping questionnaire to Chandan.  *See* Respondent Selection Memorandum (Mar. 13, 2020) (P.R. 26) (C.R. 4); *see also* AD Questionnaire (Mar. 13, 2020) (P.R. 28-29). Commerce selected Chandan because it was "the exporter accounting for the largest volume of

subject merchandise that could be reasonably examined, consistent with {19 U.S.C. § 1677f-1 (c)(2)(B)}." IDM at 38. Specifically, Chandan was the largest exporter by volume during the POR. *Id.* No company sought to be a voluntary respondent, as made possible by 19 U.S.C. § 1677m(a) and 19 C.F.R. § 351.204(d).

In June and July 2020, Chandan timely submitted responses to portions of Commerce's initial questionnaire, including pertaining to Section B (Sales in the Home Market or to a Third Country), Section C (Sales to the United States), and Section D (Cost of Production and Constructed Value). *See* Chandan Section B-C Questionnaire Resp. (Jun. 30, 2020) (P.R. 67) (C.R. 41-57); Chandan Section D Questionnaire Resp. (Jul. 6, 2020) (P.R. 70-74) (C.R. 58-70).

In September 2020, Commerce issued supplemental questionnaires in relation to Section B, Section C, and Section D, to which Chandan responded. *See* Chandan Section B and Section C Supp. Questionnaire Resp. (Sept. 9, 2020) (P.R. 90) (C.R. 83-103); Chandan Section B and Section C Supp. Questionnaire Resp. (Sept. 11, 2020) (P.R. 91) (C.R. 104-105). Chandan Section D Supp. Questionnaire Resp. (Sept. 23, 2020) (P.R. 97) (C.R. 107-119).

On October 9, 2020, Chandan submitted a request to correct clerical errors. *See* Chandan's Request to Correct (P.R. 101). Commerce issued a supplemental questionnaire to provide Chandan an opportunity to correct these errors. *See* Section B-D 2nd Supp. Questionnaire (Nov. 25, 2020) (P.R. 104) (C.R.122). Chandan responded in December 2020 and February 2021. *See* Chandan Section B-D 2nd Supp. Questionnaire Resp. (Dec. 9, 2020) (P.R. 111) (C.R. 123-132); Chandan Section B-D 2nd Supp. Questionnaire Resp. Cont'd (Dec. 11, 2020) (P.R. 112) (C.R. 133-145); Chandan Revised Questionnaire Resp. (Feb. 10, 2021) (P.R. 115) (C.R. 147-148).

Commerce issued its preliminary review results on February 24, 2021.  *See Stainless Steel Flanges from India: Preliminary Results of Antidumping Administrative Review; 2018-2019*, 86 Fed. Reg. 11,231 (Dep't of Commerce Feb. 24, 2021) (*Preliminary Results*) (P.R. 119), and accompanying Preliminary Decision Memorandum (PDM) (P.R. 116).  Commerce issued its final results on August 26, 2021.  In the final results, Commerce resorted to the use of fact available, pursuant to 19 U.S.C. § 1977e(a).  *See* IDM at 5-22.  Commerce moreover applied an inference adverse to Chandan in selecting from among facts available, pursuant to 19 U.S.C. § 1977e(b).  *See* IDM at 22-30.  Commerce calculated a dumping margin of 145.25 percent as to Chandan.  *See* IDM at 31-33.  Commerce then applied Chandan's rate to all other companies subject to the review and not individually examined, pursuant to 19 U.S.C. § 1673d(c)(5)(B).  *See* IDM at 33-47.

## II.    Questionnaire Responses Relating To Window Period Sales

Commerce in the course of its review identified deficiencies in Chandan's reporting.  The first issue identified relates to Chandan's provision of information regarding "window period" sales.  In administrative reviews of antidumping orders, Commerce typically compares the export price (or constructed export price) of an individual U.S. sale to an average normal value based on a contemporaneous month in a comparison market.  IDM at 8.  The preferred month for normal value is the month in which the U.S. sale was made.  *Id*.  If, however, there are during the preferred month no sales in the comparison market of a product that is identical to the subject merchandise, Commerce may base normal value on identical or similar sales in a "window period," which extends from three months prior to the month of the U.S. sale in question until two months after the month of the U.S. sale.  *Id*.  Window period information "is critical to Commerce's price-to-price margin calculation, as the best {normal value} 'match' for U.S. sales may be comparison market sales in the window period."  *Id*.

To perform the comparison of Chandan's export price to normal value, Commerce requested that Chandan provide all comparison-market sales for three months prior to the POR and two months after the POR.  *See* AD Questionnaire at B-1 (Mar. 13, 2020) (P.R. 29).  Despite this request, Chandan in response reported to Commerce only the comparison market sales it made during the POR, and did not include sales during the five-month window period.  *See* PDM at 6 (citing Chandan Section B-C Questionnaire Resp. at Exhibit B-2 (June 30, 2020) (P.R. 67) (C.R. 41-55)).

After Chandan failed to provide window period sales in its first response, Commerce issued the same instructions in a supplemental questionnaire.  *See* Supp. Questionnaire at 4-7 (Aug. 19, 2020) (P.R. 80).  On September 11, 2020, Chandan provided the window-period information, in a comparison market database titled "CSLHM03."  *See* PDM at 6 (citing Chandan Supp. Section B-C Questionnaire Resp. at attached "CSLHM03' comparison market database (Sept. 11, 2020) (C.R. 105)).  But while the database CSLHM03 included some window period sales, it did not include window period sales for products with a nominal pipe size from 0.5 inches to less than 1.5 inches, despite those sizes being subject merchandise.  *See* IDM at 6 n.32 (noting that "Chandan did not include sales of flanges with a nominal pipe size between 0.5 inches and below 1.5 inches in any of its submitted comparison market databases").  Moreover, Commerce identified other concerns with this new database.  Thus, in a second supplemental questionnaire, Commerce requested that Chandan add to its databases all products within the scope of the order, and it also requested revisions to Chandan's reported gross unit price, quantity discount, and other discounts/billing adjustments.  *See* Section B-D 2nd Supp. Questionnaire (Nov. 25, 2020) (P.R. 104) (C.R.122).

On December 9, 2020, Chandan responded to Commerce's second supplemental

questionnaire by providing a revised comparison market sales database, named

"CSLAR1HM03."  *See* Chandan Resp. to 2nd Supp. Questionnaire (Dec. 9, 2020) (C.R. 123).

As with the first version of the database, however, Chandan did not provide window sales

covering the full five-month window period.  PDM at 7 (citing Chandan Supp. Section B-D

Questionnaire Resp. at 1-6 and attached "CSLAR1HM03" comparison market database (Dec. 9,

2020) (C.R. 123 and C.R. 126)).

### III.   Questionnaire Responses Relating To CONNUM-Specific Costs

In addition to window period sales, Commerce through its questionnaires also sought to

secure from Chandan accurate reporting of its production costs.  Commerce requested

information at the control number (CONNUM) level.  "'CONNUM' is a contraction of the term

'control number,' and is Commerce jargon for a unique product."  *Xi'an Metals & Mins. Imp. &*

*Exp. Co. v. United States*, No. 21-2205, 2022 WL 4391436, at *2 (Fed. Cir. Sept. 23, 2022)

(*Xi'an Metals CAFC*) (quoting *Xi'an Metals & Mins. Imp. & Exp. Co. v. United States*, 520 F.

Supp. 3d 1314, 1321 n.4 (Ct. Int'l Trade 2021)).  Commerce defines CONNUMs by identifying

key physical characteristics of the subject merchandise that are commercially meaningful in the

United States marketplace and have an impact on costs of production.  CONNUM-specific data

allows Commerce to perform comparisons of its constructed normal values to export prices on as

precise a basis as possible.  Commerce has required reporting factors of production on a

CONNUM-specific basis using similar language in antidumping proceedings for over a decade.

Consistent with that practice, in Section D of Commerce's initial questionnaire, the

agency asked Chandan to report per-unit cost-of-production information for each CONNUM

included in the comparison-market sales database that Chandan provided in response to Section

B of the questionnaire.  AD Questionnaire (Mar. 13, 2020) (P.R. 28).  Chandan responded to

Section D on July 6, 2020.  *See* Chandan Section D Questionnaire Resp. (Jul. 6, 2020) (P.R. 70-74) (C.R. 58-70).  For its weighted-average costs, Chandan directed Commerce to two exhibits—Exhibit D-24 (cost build up data) and Exhibit D-15 (raw and direct material costs).  In reviewing Chandan's response, however, Commerce found that: "(1) Exhibit D-24 did not, in fact, include weighted average CONNUM costs, and (2) in comparing Exhibits D-15 and D-24, Chandan's response contained discrepancies in the reported total raw material costs between these two exhibits."  IDM at 8.

Commerce issued a supplemental questionnaire asking Chandan to provide, with respect to Exhibit D-24 (cost build-up data), "a detailed description of how {it} compiled the CONNUM-specific worksheet."  Section D Supp. Questionnaire at 4 (Sept. 2, 2020) (P.R. 85) (C.R. 82).  Commerce further asked Chandan to "provide all source documentation (*i.e.*, documentation generated in the normal course of business) relied on to compile the worksheet." *Id.*  Chandan provided no explanation in its response to this request.  Chandan stated that it was "resubmitting Exhibit D-24 as Exhibit D-39 to provide information consistent with that provided in other parts of Chandan's questionnaire response."  Chandan Section D Supp. Questionnaire Resp. at 1 (Sept. 23, 2020) (P.R. 97) (C.R. 107).  However, the two exhibits were identical. PDM at 8.

In November 2020, Commerce again asked Chandan to explain how it compiled the CONNUM-specific cost build-up data spreadsheet, Exhibit D-39, and again requested source documentation.  Section D Second Supp. Questionnaire at 7 (Nov. 25, 2020) (P.R. 104) (C.R. 122).  In response, Chandan explained that it compiled Exhibit D-39 (formerly Exhibit D-24) "based on the product drawings and the cycle times that are defined for production of these

products." Chandan Resp. to Section B-D 2nd Supp. Questionnaire at 10 (Dec. 11, 2020) (P.R. 112) (C.R. 133). Chandan also revised Exhibit D-39 to become Exhibit D-56. *Id.*

Although Chandan claimed that it derived its cost build-up data from product drawings, the theoretical weights in the product drawings for CONNUM A and CONNUM B—the CONNUMs with the highest volume of sales in the two respective markets—did not match the theoretical weights reported by Chandan in its cost database. PDM at 9. In addition to this discrepancy, Chandan did not provide weighted-average-cost calculation worksheets for CONNUM C and CONNUM D, and provided incomplete weighted-average calculation worksheets for CONNUM A and CONNUM B. IDM at 17 (citing Chandan Resp. to Section B-D 2nd Supp. Questionnaire at Exhibits D-55 and D-56 (Dec. 11, 2020) (C.R.144)).

## IV.    Questionnaire Responses Relating To Other Issues

Chandan's questionnaire responses contained additional shortcomings. The first related to Chandan's reporting of gross unit price. In response to a supplemental questionnaire, Chandan provided a calculation worksheet that reported its gross unit price net of "other discounts." *See* Chandan Section B and Section C Suppl. Questionnaire Resp. at 6-7 and Exhibits B-23 and B-24 (Sept. 9, 2020) (P.R. 90-91) (C.R. 83-104). Commerce asked Chandan to revise its database to provide its gross unit price without deductions for discounts, rebates, or any other adjustment, and to provide documentation to substantiate its response. See PDM at 10. In response, Chandan stated that it "reported the gross unit price for all transactions without deducting any discounts or rebates." Chandan Resp. to 2nd Supp. B-C Questionnaire at 4 (Dec. 9, 2020) (P.R. 111) (C.R. 83). However, Chandan failed to substantiate its response with any documentation. Moreover, the database provided with this response indicated that Chandan did not make any adjustments to its reported gross unit price field. PDM at 10.

Chandan's questionnaire responses were also insufficient with respect to quantity discounts. In its first questionnaire response, Chandan stated that "quantity discounts are being reported against each invoice in the subsequent calendar year for which the customer has qualified {sic} the quantity discount conditions in the previous calendar year," and that it "ha{d} prepared a summary of the discounts allowed to its customers in {the comparison market} and allocated these discounts uniformly across the sales of all products sold to these customers." *See* Chandan Section B-C Questionnaire Resp. at B-36 (June 30, 2020) (P.R. 67) (C.R. 41). In a supplemental questionnaire, Commerce asked Chandan for additional explanation and supporting information for its quantity discount reporting. *See* PDM at 11 (citing Supp. Questionnaire at 2 (Aug. 19, 2020) (P.R. 80) (C.R. 81)). However, Chandan's responses were inconsistent; it stated that quantity discounts were applied in the year after a qualifying quantity of sales was achieved, but other information provided by Chandan indicated that it applied quantity discounts in the same year as when qualifying levels were met. *See* PDM at 11.

In addition to inadequate reporting of gross unit pricing and quantity discounts, Chandan also deficiently reported other discounts. Chandan claimed to report, as part of other discounts, certain claims and debit notes. PDM at 12 (citing Chandan Section B-C Questionnaire Resp. at B-36 to B-37 (June 30, 2020) (P.R. 67) (C.R. 41)). Commerce asked Chandan to report these in a separate field, and to provide documentation to substantiate its response. *See* PDM at 12 (citing Section B-D 2nd Supp. Questionnaire (Nov. 25, 2020) (P.R. 104) (C.R.122)). In response, Chandan stated that it was "reporting the other discounts against each invoice to which this billing adjustment relates," and that "{t}he revised values {were} reported in the comparison market database" in a separate field. Chandan Resp. to 2nd Supp. Questionnaire at 4 (Dec. 9, 2020) (P.R. 111) (C.R. 123). However, Chandan provided no documentation to substantiate its

response, and a comparison between the earlier and later versions of its comparison market database demonstrated that the other discounts field had not been adjusted, and that Chandan had not in fact reported a separate billing adjustments field.  PDM at 12.

Finally, Chandan failed to support its reporting of a field relating to "U.S. duty refunds." Commerce requested that Chandan: (1) report the date of any such refund, (2) provide documentation of the refund, and (3) adjust its database to indicate that the refund was zero for any discount not yet received.  PDM at 12 (citing Section B-D 2nd Supp. Questionnaire at 4 (P.R. 104) (C.R.122)).  In response, Chandan stated that it had "updated the US sales database as instructed."  Chandan Resp. to 2nd Supp. Questionnaire at 10 (Dec. 9, 2020) (P.R. 111) (C.R. 123).  However, a comparison revealed that Chandan did not update the database as requested, and Chandan also did not provide the requested supporting documentation.  PDM at 13.

## V.    **Commerce's Preliminary Results**

### A.    **Commerce Uses Facts Otherwise Available**

In its preliminary results, Commerce found it necessary, pursuant to 19 U.S.C. § 1677e(a), to use "facts otherwise available" in determining Chandan's dumping margin for the period of review.  *See* PDM at 5-13.  Commerce's first reason for using facts otherwise available was the deficiencies in Chandan's responses to the agency's multiple requests for information regarding comparison market window period sales.  PDM at 6-7.  Chandan had listed all requested window period sales in only one intermediate version of its comparison market sales database, and in that attempt the information was so inaccurate as to be unusable.  The final version of the comparison market sales database did not list all window-period sales.  PDM at 7. Commerce therefore concluded that necessary information was missing from the record, within the meaning of 19 U.S.C. § 1677e(a)(1), because "Chandan failed to report complete sales information in its comparison market database."  *Id.*  Moreover, where Chandan had provided

the requested information, it "failed to report that data in the form or manner required," within the meaning of 19 U.S.C. § 1677e(a)(2)(B), "despite the fact that Commerce requested this information on two separate occasions"  PDM at 7.  Finally with respect to window period sales, Commerce found that Chandan had impeded the proceeding, within the meaning of § 1677e(a)(2)(C), by excluding the requested data from Chandan's most recent comparison market database:  The requested information was "critical to Commerce's price-to-price margin calculation, as the best {normal value} match for U.S. sales may be comparison market sales in the window period."  *Id.*

Commerce's preliminary decision to use facts otherwise available was also based on "pervasive reporting deficiencies relating to Chandan's CONNUM-specific costs."  PDM at 8. Commerce explained that it requires respondents to report costs on a CONNUM-specific basis because the agency "relies on such costs in applying the 'cost test' in the comparison market program and in {its} identification of 'identical' or 'similar' products (for price-to-price matching purposes) in the margin program."  PDM at 7-8.  After initially failing to adequately respond to Commerce's initial questionnaire, Chandan had provided product drawings for CONNUMs A and B, but "the figures contained in the product drawings {did} not match the figures reported in the cost database."  *Id.* at 9.  "These deficiencies relate{d} to the CONNUMs with the highest volumes of sales in each market, which were specifically sampled by Commerce as test cases for closer scrutiny."  *Id.*  The nature and extent of these errors in turn gave Commerce "no confidence in the accuracy of the reported costs for the remaining products."  *Id.* These deficiencies, in combination with other reporting deficiencies in relation to CONNUM-specific costs, led Commerce to conclude that necessary information relating to CONNUM-specific costs was not available on the record, within the meaning of 19 U.S.C. § 1677e(a)(1).

*Id.* Moreover, Commerce concluded, Chandan had withheld information requested by Commerce, and provided inaccurate data, thereby substantially impeding the proceeding. *Id.* at 9-10. Thus, use of facts available was also warranted pursuant to § 1677e(a)(2)(A) and (C). *Id.* at 10.

After addressing Chandan's failings in the reporting of window period sales and CONNUM-specific costs, Commerce described additional deficiencies that Chandan had failed to remedy. PDM at 10-13. These included the following: (1) Chandan's reporting of its gross unit price, which was "not provided in the manner in which Commerce requested," PDM at 10; (2) the reporting of quantity discounts, which was unreliable due to Chandan's failure to actually make adjustments that were claimed to have occurred in its supplemental questionnaire responses, PDM at 10-11; (3) Chandan's responses in relation to other discounts, PDM at 12; and (4) Chandan's failure to update its database and provide supporting documentation in relation to claimed United States duty refunds. PDM at 12-13.

## B. Commerce Applies An Adverse Inference In Selecting From Among Facts Available

Having preliminarily concluded that resort to facts available was warranted, Commerce proceeded to preliminarily determine that it would use an inference adverse to Chandan's interests in selecting from among facts otherwise available, pursuant to 19 U.S.C. § 1677e(b). PDM at 13-15. Commerce concluded that Chandan's reporting deficiencies demonstrated that Chandan had failed to cooperate by not acting to the best of its ability in responding to Commerce's requests for information. PDM at 14. Despite having window period sales information in its possession, Chandan had failed "to correct deficiencies in {its} data and then to report the revised sales information in its ultimate comparison market database." *Id.* Similarly, despite having CONNUM-specific costs in its possession, Chandan had failed to

provide complete and accurate information, which "rendered its entire cost response unusable." *Id.* And despite explicit requests from Commerce, Chandan failed to correct its reported gross unit price, to revise or support its reporting of quantity and other discounts, or to revise or support its reporting of duty refunds—all despite the fact that, again, Chandan had the information in its possession. *Id.* These deficiencies demonstrated that Chandan had failed to act to the best of its ability. *Id.*

In addition to the above-referenced deficiencies, Commerce noted additional indications that Chandan's reporting was inattentive and unreliable. *See* PDM at 14. Chandan's initial reporting of comparison market sales and costs excluded flanges below a certain size despite those sizes being unequivocally included within the scope of the order. *Id.* Chandan was also inconsistent in its assignment of products to particular CONNUMs, and failed in several instances to provide explanations and supporting documentation when requested. *Id.* at 15. These shortcomings were despite Commerce granting numerous extensions of time, and the agency issuing supplemental questionnaires to permit Chandan to correct its reporting. *Id.* Finally, Commerce noted that Chandan was a large exporter with prior experience in Commerce proceedings. *Id.*

For all of these reasons, Commerce concluded that Chandan had failed to cooperate by not acting to the best of its ability; instead, "{t}he level of inattentiveness and inaccuracy of its reporting throughout {the} review undermine{d} the reliability of Chandan's responses" and warranted the application of an adverse inference in selecting from the facts available. *Id.*

### C.    **Rate Selection**

Commerce next addressed the adverse rate to be applied to Chandan. Commerce noted that its practice in selecting a rate based on adverse inferences is to use the higher of (1) the highest corroborated rate from the petition or (2) the highest calculated rate for any respondent

from any segment of the proceeding, which Commerce is not required to corroborate, under

19 U.S.C. § 1677e(c)(2).  PDM at 16-17.  Commerce preliminarily assigned Chandan a dumping

margin of 145.25 percent, which was the highest dumping margin calculated in the petition.  *Id.*

at 17.  Moreover, because the rate was a calculated rate assigned to Bebitz Flanges Works

Private Limited (Bebitz) in the original investigation, Commerce was not required to corroborate

that rate in the review.  *Id.*  Commerce noted however, that Bebitz's rate, which had been based

on the petition rate, was corroborated in the investigation with reference to the transaction-

specific dumping margins of Chandan, which had been a mandatory respondent in the

investigation.  PDM at 17 n. 98.

### D.  <u>Rate Applied To Non-Examined Companies</u>

Commerce finally addressed the rate to be applied to companies not selected for

individual examination.  PDM at 17-18.  Commerce noted that in such situations, it typically

looks to 19 U.S.C. § 1673d(c)(5), which instructs that if the estimated weighted average dumping

margins established for all exporters and producers individually investigated are determined

entirely under 19 U.S.C. § 1677e, *i.e.*, using AFA-rates, then Commerce "may use any

reasonable method to establish the estimated all-others rate for exporters and producers not

individually investigated, including averaging the estimated weighted average dumping margins

determined for the exporters and producers individually investigated."  PDM at 17-18 (citing

19 U.S.C. § 1673d(c)(5)(B)).  Commerce described averaging the estimated weighted average

dumping margins as the "expected method," with reference to *Albemarle Corp. v. United States*,

821 F. 3d 1345 (Fed. Cir. 2016) (*Albemarle*).  *See* PDM at 18.  The only margin determined in

the review was Chandan's, and its rate had been based entirely on the use of facts available with

an inference adverse to Chandan.  Thus, "{i}n accordance with {*Albemarle*}, and pursuant to

{§ 1677e(c)(5)(B)}," Commerce preliminarily assigned this 145.25 percent rate to the companies

subject to the review and not individually examined, "consistent with the expected method." PDM at 18.

## VI.   <u>Commerce's Final Results</u>

In its final results, Commerce made no changes to its preliminary results, and assigned Chandan a dumping margin of 145.25 percent. *Final Results*, 86 Fed. Reg. at 47,619. Commerce also continued to assign the companies not individually examined a dumping margin of 145.25 percent. *Id.* at 47,619-20.

Commerce continued to find that Chandan's failure to fully report its comparison market sales supported the use of facts otherwise available. IDM at 7-11. Commerce also again concluded that Chandan failed to report costs at the CONNUM level. *Id.* at 14-19. Moreover, Chandan's response contained additional deficiencies that Chandan failed to remedy, relating to gross unit price, quantity discounts, other discounts, and U.S. duty refunds. *Id.* at 19-22.

With respect to the application of an adverse inference, Commerce continued to find that Chandan had withheld requested information, failed to provide information in the form and manner requested, and significantly impeded the proceeding. IDM at 25. Commerce further concluded that Chandan had failed to cooperate to the best of its ability, and adverse inferences were warranted. *Id.* Commerce concluded that Chandan's deficiencies in sales and cost data were so fundamental and pervasive that it was appropriate to based Chandan's final dumping rate on total AFA. *Id.*

With respect to the rate, Commerce rejected Chandan's argument that the agency had not previously found a dumping margin close to the 145.25 percent rate. To the contrary, Commerce noted, the agency had applied that rate in an earlier segment of the same proceeding, applying an adverse inference with respect to facts available in calculating a dumping margin for Bebitz—a rate that in turn had been based on Chandan's own transaction-specific dumping margins. IDM

at 31-32.  Moreover, Commerce concluded, the 145.25 percent rate would be sufficiently adverse so as to effectuate the statutory purpose of inducing Chandan to provide Commerce with complete and accurate information in a timely manner, and would ensure that Chandan did not obtain a more favorable result through non-cooperation.  *Id.* at 32.

Commerce furthermore continued to apply Chandan's rate to all other companies subject to the review and not individually examined, pursuant to 19 U.S.C. § 1673d(c)(5)(B).  *See* IDM at 33-48.  Chandan was the largest exporter by volume during the POR.  *Id.* at 38.  Generally, Commerce is precluded by statute from using an "all-others" rate based entirely on facts available.  *Id.* (citing 19 U.S.C. § 1673d(c)(5)).  But because there was no rate determined other than Chandan's AFA rate, Commerce concluded that it was necessary to rely on 19 U.S.C. § 1673d(c)(5)(B).  As discussed above, that statute provides that where all individual rates for investigated respondents are based on AFA, Commerce may "use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated." *Id.* § 1673d(c)(5)(B).  Commerce noted that Congress, in the Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. 103-316 (1994) (SAA), *reprinted in* 1994 U.S.C.C.A.N. 4040, stated that the "expected method" in such cases will be to weight-average the zero and *de minimis* margins and margins determined pursuant to facts available, provided that volume data is available.  IDM at 39 (citing SAA at 873).  Commerce concluded that, based on substantial record evidence, Chandan as the largest exporter was representative of all exporters and producers for which a review had been requested.  IDM at 41.  Thus, Commerce concluded, the use of the expected method was reasonable.

## SUMMARY OF ARGUMENT

Commerce's use of facts otherwise available with an adverse inference is supported by substantial evidence and in accordance with law.  Necessary information was missing from the

record, rendering Chandan's entire sales and cost databases unusable.  Moreover, Chandan failed to cooperate to the best of its ability.  Commerce issued several supplemental questionnaires to Chandan describing omissions and deficiencies in Chandan's questionnaire responses, but Chandan continued to provide inconsistent and incomplete data, as well as incorrect statements regarding its data corrections.  Even with multiple opportunities and generous extensions of time, Chandan failed to provide missing information, and failed to correct inaccurate information.  Moreover, Commerce appropriately selected the highest calculated rate from any segment in the proceeding, namely the AFA rate applied to Bebitz in the investigation, which in the investigation was corroborated by Chandan's own transaction-specific dumping margins.

Commerce's decision to assign Chandan's rate to non-examined companies also is lawful and supported by substantial evidence.  The Federal Circuit held in *Albemarle* that the rates for mandatory respondents should be considered representative unless substantial evidence demonstrates otherwise.  Here, Commerce found a lack of substantial evidence to show that Chandan's rate did not reflect the rates for non-examined companies.  Commerce rationally concluded that other rates now pressed by plaintiffs were not the most accurate reflection of the dumping margins for non-examined companies.  Moreover, neither Kisaan nor the Other Plaintiffs objected to the mandatory respondent selection process or sought voluntary respondent status prior to Commerce's preliminary determination.  Having made that choice, they are not entitled to complain that Commerce based the all-others rate on the mandatory respondent's AFA rate.

## ARGUMENT

## I.    Standard Of Review

In reviewing Commerce's antidumping duty determinations, "the Court of International Trade must sustain 'any determination, finding or conclusion found' by Commerce unless it is

'unsupported by substantial evidence on the record, or otherwise not in accordance with the law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)). "The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009).

Substantial evidence means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009) (citation omitted). Further, even if the Court may draw two inconsistent conclusions from the record evidence, that possibility "does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

A party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted), and the Court will sustain Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from them. *See Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984); *Shandong Huarong Gen. Corp. v. United States*, 159 F. Supp. 2d 714, 718 (Ct. Int'l Trade 2001).

## II.   Commerce's Use Of Facts Available With An Adverse Inference Is Supported By Substantial Evidence And In Accordance With Law

### A.   Legal Framework

Commerce "shall" use facts otherwise available to fill gaps in the record where either: (1) necessary information is not available; or (2) an interested party withholds information requested by Commerce, fails to provide the information by the deadline or in the manner requested,

significantly impedes the proceedings, or provides information that cannot be verified.  *See*

19 U.S.C. § 1677e(a).  Furthermore, if Commerce finds that a respondent "failed to cooperate by

not acting to the best of its ability to comply with a request for information," Commerce is

permitted to apply an adverse inference in its selection of facts otherwise available.  19 U.S.C.

§ 1677e(b)(1).  The statute does not specify a required number of reporting deficiencies before

Commerce may resort to facts available with an adverse inference.  *See id*. § 1677e(b).

Moreover, Commerce's authority to apply an adverse inference does not depend on the

respondent's motivation or intent.  *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352

(Fed. Cir. 2006).

      A respondent fails to act to the best of its ability when it does not exert "maximum effort

to provide Commerce with full and complete answers to all inquiries in an investigation."  *Id*.

The standard requires that exporters "conduct prompt, careful and comprehensive investigations

of all relevant records that refer or relate to the {exports} in question to the full extent of the

{exporters'} ability to do so."  *Id*.  In selecting information to rely on as an adverse inference,

Commerce may rely on information from: (1) the petition, (2) the final determination in the

investigation, (3) any previous administrative review, or (4) any other information placed on the

record.  *See* 19 U.S.C. § 1677e(b)(2); 19 C.F.R. § 351.308(c).

      **B.**      <u>**Substantial Evidence Supports Commerce's Resort To Facts Available**</u>

      Substantial evidence supports Commerce's use of facts otherwise available in

determining Chandan's dumping margin.  Chandan failed to include all window sales in the

comparison market sales database, and failed to adequately report CONNUM-specific costs.  In

addition, Chandan's reporting was deficient with respect to gross unit price, quantity discounts,

other discounts, and duty refunds.  Reliable information is crucial to Commerce's antidumping

calculations, and yet Chandan withheld information requested by Commerce, failed to provide

information in the form and manner requested, and significantly impeded the review, even after

being offered several opportunities to correct its deficiencies.

### 1.    **Chandan Failed To Report Comparison Market Window Sales**

As Commerce found, Chandan failed to fully report its window period sales, even after

multiple requests from Commerce.  In the initial antidumping questionnaire, Commerce provided

the following instructions:

> {R}eport all sales of the foreign like product during the three
> months preceding the earliest month of U.S. sales, all months from
> the earliest to the latest month of U.S. sales, and the two months
> after the latest month of U.S. sales.

*See* AD Questionnaire at B-1 (Mar. 13, 2020) (P.R. 28).  Thus, window period sales were plainly

requested.  Despite this, Chandan reported only the comparison market sales from the POR itself,

with no window period sales.  PDM at 6 (citing Chandan Section B-C Questionnaire Resp. at Ex.

B-2 (June 30, 2020) (P.R. 67) (C.R. 41-55)).  Commerce again asked for window period sales,

on August 19, 2020.  Chandan provided window period sales in the comparison market database

submitted on September 22, 2021, but Commerce requested substantial revisions.  *See* PDM at 7

(citing Section B-D 2nd Supp. Questionnaire at 1-2 (Nov. 25, 2020) (P.R. 104) (C.R.122)).  In

response, Chandan submitted a comparison market database without including the full five-

months of window-period sales.  PDM at 7.  As Commerce stated, the omission of window sales

in the final database is significant, because the prior version, which did contain window-period

sales, was "so inaccurate as to be unusable."  PDM at 7.

Chandan cannot escape the consequences of its faulty comparison market sales database.

Chandan criticizes Commerce for not expressly stating "{h}ow many" window period sales are

missing from the record.  Chandan Br. 6.  But this gets it backwards:  "As the party in possession

of the necessary information, the burden is on {Chandan} to develop the record, not Commerce."

*Bebitz Flanges Works Priv. Ltd. v. United States*, 433 F. Supp. 3d 1297, 1306 (Ct. Int'l Trade 2020).  Commerce indisputably asked for the information regarding window period sales, and Chandan should not now be heard to complain that Commerce does not know the full scale of Chandan's failings.

Chandan next argues that its shortcomings are insignificant, because in its view many sales in the final comparison sales database have matches—it claims that "only 0.6% of U.S. sales are even potentially missing a window period sale."  Chandan Br. 8-9.  Chandan is able assert that its error is limited in scope only by "combin{ing}" two versions of its comparison market sales database, Chandan Br. 10, but the predicate to that combination fails—Chandan provides no reason to believe that combining two flawed versions of a database (the earlier "CSLHM03" and the later "CSLHMR03") would yield a reliable result.  Commerce reached precisely this conclusion, stating that CSLHM03 was "not accurate," and that the agency's requested adjustments to that earlier database "would have impacted the sales reporting . . . and, therefore, the data are not correct."  IDM at 8.  Moreover, Chandan's failure to report products with a nominal pipe size of 0.5 inches to less than 1.5 inches in CSLHM03 "meant that the window period sales are incomplete" in that database.  *Id.*  And so consolidating CSLHM03 and the later CSLAR1HM03 "would not provide a complete and accurate comparison market database."  *Id.*

Nor are the gaps in the record Commerce's fault, contrary to Chandan's claims.  *See* Chandan Br. 11-15.  Chandan asserts that, when the agency requested that the comparison market sales and cost of production databases cover 0.5 to 1.5 inch flanges, Commerce "did not explicitly mention the time period" for the request.  Chandan Br. 11.  But Commerce in the initial questionnaire requested that Chandan "report all sales of the foreign like product" for the

POR, the three months preceding the POR, and the two months following the POR. *See* AD Questionnaire at B-1 (Mar. 13, 2020) (P.R. 29). Commerce repeated those instructions in its supplemental questionnaire. *See* Supp. Questionnaire at 4 (Aug. 19, 2020) (P.R. 80) (C.R. 81). And in response to that supplemental questionnaire, Chandan did, in fact, provide some window period sales, so it was well aware of its responsibility to provide window period sales data.

Chandan also argues that: (1) Commerce was required to notify Chandan of its failure to report window period sales following its supplemental responses dated December 9, 2020, and (2) Commerce erroneously rejected Chandan's window period sales submission in a "no new facts" filing submitted after the preliminary results, on March 16, 2021, and which assertedly provided window period sales information for 0.5-to-1.5-inch flanges. Chandan Br. at 13-14. As explained in the final results, however, Commerce satisfied its obligation to inform Chandan of the nature of any deficiency by issuing supplemental questionnaires specifically pointing out and requesting window period sales. *See* IDM at 9. The Federal Circuit has found such notifications sufficient in analogous circumstances. *See Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1361 (Fed. Cir. 2017) (holding that Commerce did not need to provide an opportunity to address a deficiency in a supplemental response when the respondent "had already failed to provide the information requested in Commerce's original questionnaire, and the supplemental questionnaire notified {the respondent} of that defect").

Chandan emphasizes *Hitachi Energy Co., USA, Inc. v. United States*, 34 F.4th 1375 (Fed. Cir. 2022). Chandan Br. 14, 25-26. In that case, however, the respondent affirmatively requested to supplement the record after Commerce changed its methodology on remand. *See Hitachi Energy*, 34 F.4th at 1384. The Federal Circuit held that Commerce was required to provide that opportunity. *Id.* Here, in contrast, Commerce has not changed its methodology and

was consistent in requesting window period sales for all products within the scope of the order. None of the other authorities that Chandan cites require Commerce to repeatedly request window period sales in the manner suggested by Chandan. *See Mukand, Ltd. v. United States*, 767 F.3d 1300, 1306 (Fed. Cir. 2014) (setting no requirement of a specific number of supplemental questionnaires); *Forged Steel Fittings from India, Draft Remand Decision* at 13, ACCESS barcode 4243651-01 (May 19, 2022) (indicating that Commerce issued two questionnaires in lieu of verification).

Commerce was also not obligated to accept untimely new factual information from Chandan. Chandan Br. 14-15. As Commerce explained, "Chandan's interpretation would essentially require that Commerce permit any party to correct deficiencies of any magnitude, at any time during an administrative proceeding—including after Commerce has already rendered a preliminary decision." IDM at 11. Chandan had the burden of creating an accurate record and failed to meet this burden when it failed to report complete sales data. Accordingly, Commerce reasonably determined that necessary information was missing from the record, that Chandan failed to provide information in the form or manner requested, and that impeded the proceeding, such that the application of facts available was warranted pursuant to 19 U.S.C. § 1677e(a). IDM at 11.

### 2.     Chandan Failed To Accurately Report Costs At The CONNUM-Specific Level

In addition to not providing certain window-period sales for the comparison market, Chandan also failed to accurately report costs at the CONNUM level, and there were inconsistencies in Chandan's cost-reporting methodology. *See* IDM at 11-19. Commerce found the following issues: (1) discrepancies with the product drawings for the majority of products comprising CONNUM A and CONNUM B, *i.e.*, the CONNUMs with the highest volume of

sales in each market, leading Commerce to conclude that Chandan did not follow its claimed

approach to assign raw material costs; and (2) failure by Chandan to provide calculation

worksheets for CONNUM C and CONNUM D, and incomplete weighted-average calculation

worksheets for CONNUM A and CONNUM B.  IDM at 12.

Pursuant to 19 U.S.C. § 1677b(1), Commerce compares a respondent's comparison

market price to its cost of production to determine whether the foreign like product was sold at

prices above or below the cost of production.  Cost build-up data are a set of worksheets and

supporting documents that demonstrate how source information from the accounting records are

compiled and allocated between products, which is critical in demonstrating that reported costs

fairly reflect cost of production.  *See* IDM at 18.

Chandan does not maintain product-specific costs in its records, but instead uses an

allocation methodology that is heavily reliant on weight to determine the per-unit costs for each

reported CONNUM.  *Id.* at 19.  Throughout this review, Commerce repeatedly asked Chandan to

provide supportive documentation for its cost reporting methodology and a detailed explanation

for the discrepancies found between its cost exhibits.  *See* IDM at 15-18 (summarizing

Commerce's requests).  Chandan, however, failed to provide full and complete answers to

Commerce's requests, and at times resubmitted prior information with little to no explanation or

support.  *Id*.  Ultimately, and as discussed below, Chandan failed to reconcile its cost reporting

methodology with the supporting information it provided on the record.  IDM at 19.

In response to the initial questionnaire, Chandan directed Commerce to Exhibit D-24

(cost build-up data) and Exhibit D-15 (raw and direct material costs) for its weighted-average

costs.  PDM at 8.  However, Commerce discovered a discrepancy in the reported total raw

material costs between the two exhibits.  Commerce therefore issued a supplemental

questionnaire, asking Chandan to "provide a detailed explanation of why the information provided in Exhibit D-24 {cost build-up data} is inconsistent with information provided in other parts of Chandan's questionnaire response." *Id*. (citing Supp. Questionnaire at 4 (Sept. 2, 2020) (P.R. 85) (C.R. 82)).  Despite Commerce's request, Chandan provided no explanation of these discrepancies, instead simply stating that it was "resubmitting Exhibit D-24 as Exhibit D-39 to provide information consistent with that provided in other parts of Chandan's questionnaire response."  PDM at 8 (citing Chandan Section D Supp. Questionnaire Resp. (Sept. 23, 2020) (P.R. 97) (C.R. 107)).

A comparison between Exhibits D-24 and D-39 indicated that, contrary to Chandan's suggestion, Chandan did not make any adjustments—the exhibits were identical.  PDM at 8. Thus, in November 2020, Commerce issued another supplemental questionnaire asking Chandan to "provide a detailed description of how {it} compiled the CONNUM-specific worksheet in Exhibit D-39 {cost build-up data}," and to "provide all source documentation . . . relied on to compile the worksheet"  IDM at 18 (quoting Section B-D 2nd Supp. Questionnaire at 9 (Nov. 25, 2020) (P.R. 104) (C.R.122)).  In response, Chandan explained that it compiled Exhibit D-39 "based on the product drawings and the cycle times that are defined for production of these products."  Chandan Section B-D 2nd Supp. Questionnaire Resp. (Dec. 11, 2020) (P.R. 112) (C.R. 133).  However, in reviewing the record, Commerce discovered that Chandan did not follow the methodology it stated it used to assign costs.  *See* IDM 12-18.  Specifically, although Chandan had provided product drawings for the majority of products comprising CONNUM A and CONNUM B, the theoretical weights reported in the drawings did not tie to the theoretical weights reported in Chandan's cost database.  IDM at 12.

In addition, Chandan failed to provide its weighted-average costs on a CONNUM-specific basis—it instead reported multiple costs for a single CONNUM.  IDM at 19.  Commerce therefore asked Chandan to "'report the weighted-average per-unit cost for each CONNUM,' and {to} 'provide a weighted average calculation worksheet'" for CONNUMs A, B, C, and D.   IDM at 16 (citing Supp. Questionnaire at 4 (Sept. 2, 2020) (P.R. 85) (C.R. 82)).  However, Chandan instead provided incomplete weighted average calculation worksheets for CONNUM A and CONNUM B, and no calculation worksheets for CONNUM C and CONNUM D.  *See* IDM at 16-17.  Although Chandan showed the individual product-cost-per-unit calculation for some of the products, it did not demonstrate how it calculated the CONNUM weighted-average cost as requested.  *Id*.  A comparison between Exhibit D-23 and Exhibit D-39 also showed discrepancies in the number of products comprising CONNUM A and CONNUM B.  IDM at 17.  Therefore, Commerce once again asked Chandan to explain the CONNUM discrepancies.  *Id*.  Chandan failed to provide an explanation and stated that it resubmitted the cost-build-up calculation in Exhibit D-56.  However, Exhibit D-56 "contain{ed} the same partial details for CONNUM A and CONNUM B as it did in its prior iteration."  Moreover, Exhibit D-56 "only had partial details relating to *CONNUM A and CONNUM B*, thereby failing to provide information on the weighted-average calculations for CONNUM C and CONNUM D."  IDM at 17.

Given the deficiencies in Exhibit D-56, it is surprising for Chandan to assert that the Court should disregard the earlier problems with Exhibits D-29 and D-24, because they allegedly were corrected in Exhibit D-56.  Chandan Br. 15-16.  As  Commerce concluded, Exhibit D-56 remained inadequate and unreliable. IDM at 17.  Moreover, although Chandan claims that it "rectified any minor discrepancies," by submitting "Exhibit D-53 (revising Exhibits D-32 and D-

15) and Exhibit D-56 (revising Exhibits D-39 and D-24)," *id.* at 15-16, Chandan wholly fails to explain how any deficiencies were in fact rectified.

In the face of these deficiencies, Chandan attempts to shift direction, claiming that, whatever the deficiencies of Exhibit D-56, "Exhibit D-59 has cost build-ups for <u>all</u> products, not just CONNUMs A to D" and that "the weighted average cost of production reported in Exhibits CB-1 to CB-4 reconciles to Chandan's latest COP database."  Chandan Br. 16.  But Commerce found deficiencies in Chandan's CONNUM-specific reporting.  Chandan determined the reported per-unit cost using the "absorption cost method" and relied on the weight of a product to allocate raw material costs.  IDM at 19 (citing Chandan Section D Questionnaire Resp. at 35 (Jul. 6, 2020) (P.R. 70) (C.R. 58).  Thus, even if Chandan's reported total costs may reconcile to the costs on its financial statements and COP database, it does not make these costs accurate at the CONNUM-specific level.  *See* IDM at 19.  Nor is Chandan assisted by Exhibits CB-1 to CB-4.  Chandan Br. at 16.  These are summary exhibits filed with Chandan's case brief on May 4, 2021—they did not add new information to the record, and did not make Chandan's cost-reporting methodology accurate .

As discussed above, in addition to not providing cost build-up information, Chandan also failed to explain discrepancies in its submissions, despite being the opportunity to do so.  Most notably, Chandan did not explain why the theoretical weights in Chandan's cost database did not match the theoretical weights detailed in the product drawings—supposedly the same values.  IDM at 19.  Chandan now asserts that that it did not improperly report its weights because "it got the product weights from the submitted product drawings based on references to input weight, forged weight and output weight among other technical parameters."  Chandan Br. 18 (quotations omitted).  It further asserts that these "other technical parameters (including

dimensional tolerance) in the product drawings affect weight, a key factor to determine the cost

of raw materials." *Id*. at 18-19 (quotations omitted).  Whatever the explanation now, at no point

during the review did Chandan indicate that dimensional tolerances were used for cost reporting,

or that the weights identified in the product drawings differed from the weights it used in its

reporting.  *See* IDM at 17-18.  Commerce repeatedly asked Chandan to provide details and

supportive documentation for its cost reporting methodology.  Each time a discrepancy was

found, Chandan provided additional parameters (most recently, dimensional tolerances) to

explain the discrepancies.  *Id*.  Indeed, Chandan undermines its own argument by asserting that

dimensional tolerances are merely one "among" the technical parameters that are determine

product weights.  Chandan Br. at 18.  Chandan neither provided information about nor explained

the impact of these other technical parameters.  *See* IDM at 18.

 Furthermore, Commerce was under no obligation, under 19 U.S.C. § 1677m, to seek

clarification or to allow Chandan another opportunity to clarify its cost reporting methodology.

Chandan Br. 21.  Chandan stated, in its submission dated December 11, 2020, that its "raw

material cost is prepared by using the steel grade mentioned on the product drawing with the

input weight of raw materials and the output weight of the product."  IDM at 17 (quoting

Chandan Section B-D 2nd Supp. Questionnaire Resp. Cont'd, at 11 (Dec. 11, 2020) (P.R. 112)

(C.R. 133)).  This was an unambiguous statement that Chandan relied on the product drawings

for input and output weights.  IDM at 18-19.  Commerce not required to seek further clarification

of Chandan's unqualified statement, particularly because Chandan had multiple opportunities to

provide the requested information.

 Chandan's cited authority undermines its assertions.  Chandan Br. 20 (citing *Jindal Poly*

*Films v. United States*, 365 F. Supp. 3d 1379, 1386 (Ct. Int'l Trade 2019)).  The plaintiffs in

*Jindal* sought clarification on how Commerce would interpret an issue and what information was necessary.  *Id*.  Chandan made no such effort.  Because Chandan failed to provide accurate and consistent responses to specific questions, necessary information with respect to Chandan's cost data was not available on the record, and, thus, the application of facts available was warranted.

### 3.      Chandan Failed To Correct Other Deficiencies

Commerce also discovered additional reporting deficiencies, pertaining to Chandan's reported gross unit price, quantity discounts, other discounts, and duty refunds.  *See* IDM at 19.  When Commerce asked Chandan to revise its database to provide gross unit price without deductions for discounts, rebates, or any other adjustment, and to provide documentation to substantiate its response, Chandan failed to make any adjustments to its reported gross unit price field; nor did it provide any substantiation.  *See* IDM at 19.  Chandan now asserts that "Commerce could have consolidated {the information on the record} and computed a gross unit price without any adjustments for a usable comparison market database."  Chandan Br. 24.  In making this argument, Chandan implicitly concedes that it did not report the information in the manner requested.  More to the point, however, Commerce is not required to correct Chandan's deficient reporting.  *See Societe Nouvelle De Roulements (SNR) v. United States*, 910 F. Supp. 689 (Ct. Int'l Trade 1995) (holding that "Commerce is not required to correct respondent's errors when respondent has reported erroneous data and has failed to timely correct it").

Commerce also requested that Chandan adjust its quantity discount to be consistent with its stated methodology (*i.e*., to apply the discount to sales in the year in question) and to revise its "reported quantity discounts to be allocated on the gross invoice value and provide documentation to substantiate {its} response."  PDM at 11 (citing Section B-D 2nd Supp. Questionnaire at 2 (P.R. 104) (C.R.122)).  In response, Chandan provided the same database as it had previously, with no adjustments.  *Id*.  Chandan argues that the reported quantity discount is

insignificant to the total sales value and that, at best, partial adverse facts is warranted. Chandan Br. 24. As Commerce concluded, however, even if such sales-reporting deficiencies in isolation may not reflect pervasive issues within the record, when reviewed together with the other cost and sales reporting deficiencies, Chandan's sales data was rendered unusable. IDM at 21.

Nor can Chandan prevail in its assertion that Commerce needed to take steps to correct or modify Chandan's reported data as to these other deficiencies. Chandan Br. 25. As Commerce found, even if individual issues might be remediable, the prevalence of such deficiencies in Chandan's response rendered Chandan's data unusable, particularly because Chandan, in several instances explicitly stated that the deficiencies had been addressed when, in fact, they had not. IDM at 21.

In sum, substantial evidence supports Commerce's conclusion that Chandan failed to report complete sales information in its comparison market and U.S. sales databases, such that necessary information was missing from the record, within the meaning of 19 U.S.C. § 1677e(a). *See Hung Vuong Corp. v. United States*, No. 19-00055, 2021 WL 4772962, at *3 (Ct. Int'l Trade Oct. 12, 2021) (*Hung Vuong*) (holding that when critical data to the antidumping analysis is unusable, it is not possible to use any of the data to determine a final dumping margin using partial AFA). Moreover, where Chandan did provide requested data, Chandan often failed to report that data in the form or manner required. In excluding these data and/or providing misleading or inaccurate responses to Commerce's questions, Chandan also impeded the review, within the meaning of § 1677(a)(2)(C).

### C.   Commerce's Decision To Apply Total Adverse Facts Available With An Adverse Inference Is Based On Substantial Evidence And In Accordance With Law

Commerce also reasonably determined that Chandan failed to cooperate by not acting to the best of its ability to comply with Commerce's requests for information, making it appropriate

to use an adverse inference in selecting from among the facts otherwise available, pursuant to 19 U.S.C. § 1677e(b).  "Compliance with the 'best of its ability' standard is determined by assessing whether respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." *Nippon Steel Corp. v. United States* 337 F.3d 1373, 1382 (Fed. Cir. 2003).  "{A}n adverse inference may be appropriate where an interested party has been notified of a defect in its questionnaire response yet continues to provide a defective response." *Hyundai Electric & Energy Systems Co., Ltd. v. United States*, 15 F.4th 1078, 1090 (Fed. Cir. 2021) (citing *Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1361 (Fed. Cir. 2017)).

The multiple indications of Chandan's inattentiveness are more than sufficient to demonstrate that Chandan did not put forth maximum effort.  Chandan had window period sales information in its possession, as evidenced by its questionnaire response dated September 11, 2020, but it failed to correct data deficiencies and report the revised sales information in its final comparison market sales database.  IDM at 26.  Chandan failed to provide complete and accurate CONNUM-specific costs, again despite having this information within its possession.  *Id.* Chandan reported costs that do not match the underlying product drawings that Chandan identified as the basis for its reporting, and failed to explain the discrepancies.  Finally, Chandan failed to correct its reported gross unit price and to revise or support its reporting of its discounts and duty refunds, despite possessing this information and Commerce's requests.  *See id*. Additionally, Chandan omitted all sales of, and costs for, flanges below a certain diameter measurement, even though these flanges are plainly within the scope of the antidumping order. IDM at 27.  Given that Commerce's comparison market and margin analyses are performed on a CONNUM basis, this deficiency was critical to Commerce's overall analysis.  *Id*.

Taken as a whole and as stated by Commerce, "{t}his does not reflect the behavior of a party who is cooperating to the best of its ability."  IDM at 27; *see Mukand, Ltd. v. United States*, 767 F.3d 1300, 1306-08 (Fed. Cir. 2014) (respondent did not act to the best of its ability where Commerce requested information on five separate occasions but respondent still failed to produce); *see also Nippon Steel*, 337 F.3d at 1382 (holding that the "best of its ability" standard "does not condone inattentiveness, carelessness, or inadequate record keeping").  As the Federal Circuit recently made clear, failure to report accurate control number information will support application of total adverse facts available.  *Xi'an Metals CAFC*, 2022 WL 4391436, at *7; *see also Hung Vuong Corp.*, 2021 WL 4772962, at *5 (sustaining application of total adverse facts available based in part on respondent's failure to report accurate CONNUM information).

Chandan blames Commerce for its own deficient effort, asserting that it was an unsophisticated respondent, that Commerce was insufficiently generous in granting extensions despite the COVID-19 pandemic, and that there is evidence that Chandan acted to the best of its ability.  Chandan Br. 27-34.  These arguments cannot succeed.  Commerce was not, pursuant to 19 U.S.C. § 1677m(c)(2), obligated to provide Chandan with even more assistance than it did by issuing specific requests in supplemental questionnaires.  Moreover, Chandan is not an inexperienced respondent.  Even if this is Chandan's first *administrative review* in the past 18 years, Chandan Br. 29, Chandan is a large exporter of the subject product.  Moreover, it participated in the underlying investigation and has knowledge and experience regarding the reporting requirements associated with antidumping proceedings.  IDM at 28.  Chandan cites a case concerning a small, first-time, *pro se* respondent.  Chandan Br. 29 (*citing Calcutta Seafoods Pvt. Ltd. v. United States*, 495 F. Supp. 3d 1318, 1332 (Ct. Int'l Trade 2021)).  The facts here are different.

With respect to extensions, Chandan Br. 29-33, Commerce granted nine extensions to Chandan, on April 15, 2020, May 11, 2020, May 14, 2020, June 26, 2020, August 26, 2020, September 2, 2020, September 9, 2020, September 16, 2020, and December 3, 2020.  IDM at 28, n.167.  Chandan vaguely argues that certain extension denials by Commerce were arbitrary and capricious.  Chandan Br. 32 (asserting that "essentially 19 working days of extension {were} granted, 63% of the 31 days requested").  Chandan provides no reason why Commerce's actions were an abuse of discretion.  Chandan also neglects to mention that deadlines in this case were twice tolled due to COVID-19, once for 50 days and again for an additional 60 days.  *See* COVID-19 Tolling Memo. (Apr. 24, 2020) (P.R. 46); Tolling Memo. (July 22, 2020) (P.R. 78).

Chandan additionally relies on the fact that on one occasion it affirmatively raised to Commerce the inadequacy of a prior submission.  Chandan Br. 33-34.  But after Commerce issued a supplemental questionnaire asking Chandan to explain its errors, on November 25, 2020, Chandan provided no explanation and its newly submitted Exhibit D-56 contained the same shortcomings as prior submissions.  *See* IDM at 17.

Chandan also presents an overarching argument that its errors in the course of the review are insufficient to support the application of an adverse inference.  Chandan Br. 34-35.  It asserts that the use of an adverse inference is appropriate only where no reported data is reliable or usable, or the bulk of it is determined to be flawed and unverifiable due to pervasive and persistent deficiencies.  *Id.* at 35.  Here, however, Commerce specifically concluded that "the current record information is incomplete and cannot be used without undue difficulties."  IDM at 11.  That is conclusion is supported by substantial evidence and Commerce is permitted by law to apply an adverse inference in these circumstances.

**III.    Commerce's Use Of A Rate From A Prior Segment Of The Proceeding Is Supported By Substantial Evidence And In Accordance With Law**

**A.    Legal Framework**

Where Commerce decides to use AFA, the agency is permitted to "use any dumping margin from any segment of the proceeding under the applicable antidumping order." 19 U.S.C. § 1677e(d)(1)(B).  Commerce's application of a rate in such circumstances, including the application of the highest such rate, may be based on the agency's evaluation of the situation that resulted in it using an adverse inference.  *Id.* § 1677e(d)(2).  When selecting an adverse rate from among the possible sources, Commerce seeks to use a rate that is sufficiently adverse to effectuate the statutory purpose of inducing respondents to provide Commerce with complete and accurate information in a timely manner.  *See Ozdemir Boru San. Ve Tic. Ltd. v. United States*, 273 F. Supp. 3d 1225, 1245 (Ct. Int'l Trade 2017).  This ensures "that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully."  *See* SAA at 870.

**B.    The Selection Of The AFA Rate Is Supported By Substantial Evidence**

Chandan asserts that the 145.25 percent dumping margin assigned to it is unlawful, because Commerce did not undertake the evaluation of the situation required by 19 U.S.C. § 1677e(d)(2).  Chandan Br. 35-40.  Chandan did not make this argument during the administrative proceeding—it instead argued that Commerce should have used a rate from a prior proceeding, and did not refer to § 1677e(d)(2).  *See* Chandan Case Br. 29-30 (P.R. 158).  By regulation, Chandan was required to present all issues and arguments in its administrative case brief.  *See* 19 C.F.R. § 351.309(c)(2).  Because Chandan did not make the argument in its case brief, it is now waived.  *See Dorbest Ltd. v. United States*, 604 F.3d 1363, 1375 (Fed. Cir.

34

2010) (holding that a party's "failure to raise its issue in its administrative case brief constituted a failure to exhaust administrative remedies").

Even if the issue were preserved for review, Commerce's rate selection did not violate 19 U.S.C. § 1677e(d)(2).  Commerce did in fact evaluate the circumstances that led to the imposition of AFA.  Specifically, as Commerce noted that "Chandan was uncooperative and did not act to the best of its ability in this review."  IDM at 31.  "As a result, to create a proper deterrent against future non-cooperation, Commerce continues to find that application of the highest rate assigned under this order is appropriate."  *Id.*  Commerce's conclusion is supported by substantial evidence and lawful.  *See Hung Vuong*, 2021 WL 4772962, at *6 (finding Commerce's evaluation sufficient where Commerce considered the respondent's actions that also led to the imposition of AFA).

Moreover, the rate assigned to Bebitz in the investigation was corroborated by relying on Chandan's calculated transaction-specific margin in the investigation.  PDM at 17 n.98.  The use of such transaction-specific rates may sufficiently corroborate an AFA rate when such data was obtained from the non-cooperating party.  *See Papierfabrik August Koehler Se v. United States*, 843 F.3d 1373, 1380–82 (Fed. Cir. 2016); *PAM S.P.A. v. United States*, 582 F.3d 1336, 1340 (Fed. Cir. 2009); *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1339 (Fed. Cir. 2002).

Finally, Chandan argues that it inadvertently included AD/CVD cash deposits in its reported customs duties and that this amount should be removed from the record.  Chandan Br. 40.  However, because Commerce determined that the application of total adverse facts available was warranted for Chandan, this argument is moot.  *See IDM* at 21.

IV.   **Commerce's Decision To Assign Chandan's Dumping Margin As The Rate For Non-Examined Companies Is Supported By Substantial Evidence And In Accordance With Law**

A.   **Legal Framework**

As noted in the statement of facts above, where, as here, dumping margins for all individually-investigated entities are zero, *de minimis*, or determined based entirely on AFA, Commerce "may use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated, including averaging the estimated weighted average dumping margins determined for exporters and producers individually investigated."  19 U.S.C. § 1673d(c)(5)(B).  The SAA directs that the "expected method" in such cases will be to weight-average the zero and *de minimis* margins and margins determined pursuant to the facts available.  SAA at 873.

The general assumption underlying the statutory framework is that "the individually examined respondents account for a majority of the market during the relevant period, and {thus} are representative at the very least in terms of aggregate volume."  *Albemarle*, 821 F.3d at 1353; *see also* 19 U.S.C. § 1677f-1(c)(2) (allowing Commerce to limit its examination to exporters or producers that account for the largest volume of subject merchandise that can be reasonably examined, when it is not practicable for Commerce to examine each company individually).  "The very fact that the statute contemplates using data from the largest volume exporters suggests an assumption that those data can be viewed as representative of all exporters."  *Albemarle*, 821 F.3d at 1353; *see also Changzhou Hawd Flooring Co. v. United States*, 848 F.3d 1006, 1012 (Fed. Cir. 2017) (*Changzhou Hawd*) (following *Albemarle* and holding that "mandatory respondents . . . are assumed to be representative").

The Federal Circuit further explained in *Albemarle* that to depart from the expected method, substantial evidence must demonstrate that the expected method is not feasible or would

not be reasonably reflective of potential dumping margins.  *Albemarle*, 821 F.3d at 1352; *see also Changzhou Hawd*, 848 F.3d at 1012 ("Under *Albemarle*, Commerce could not deviate from the expected method unless it found, based on substantial evidence, that the separate rate firms' dumping is different from that of the mandatory respondents.").  "{T}he burden of proof lies with the party seeking to depart from the expected method." *PrimeSource Bldg. Prod., Inc. v. United States*, 581 F. Supp. 3d 1331, 1338 (Ct. Int'l Trade 2022) (*PrimeSource*).

### B.     Commerce Lawfully Selected Chandan's Margin As The Rate For Non-Examined Companies

Commerce's decision to assign Chandan's rate as the rate for non-examined companies was in accordance with law, because Chandan as the mandatory respondent was determined to be representative of the non-examined companies in this review.  *See* IDM at 37.  After determining that substantial evidence on the record did not rebut the presumption that Chandan's rate was representative, Commerce calculated the rate for non-selected companies using the expected method, averaging the zero, *de minimis*, and facts available-based rates assigned to the mandatory respondents.  *See* IDM at 37.  Because the sole mandatory respondent, Chandan, was assigned a rate based on total adverse facts available, Commerce calculated an all-others rate that is, in this instance, equivalent to Chandan's AFA rate.  *Id*. at 43.  The rate for non-examined companies reflects the same 145.25 percent rate that Commerce assigned Bebitz, a mandatory respondent in the immediately-preceding segment, namely the investigation, based on application of AFA.  IDM at 43.  This rate was corroborated with the petition rate and the transaction-specific dumping margins for another mandatory respondent in the investigation, Chandan itself.  *See id.*  Because the 145.25 percent rate was based on transaction-specific margins of a mandatory respondent in the investigation, it was corroborated, and there is no basis

to disregard this rate as unrepresentative.  In other words, there is evidence in this proceeding

that a company makes sales with margins in this range.  *See id.*

Kisaan concedes that using AFA rates in calculating an all-others rate is not *per se*

unreasonable.  Kisaan Br. 14 (citing *Baroque Timber Indus. (Zhongshan) Co. v. United States,*

971 F. Supp. 2d 1333, 1341 (Ct. Int'l Trade 2014).  This concession reflects the straightforward

point that Congress, in enacting § 19 U.S.C. § 1673d(c)(5)(B), expressly established that an all-

others rate could be calculated even where all individually-investigated rates are *de minimis*,

zero, or based on AFA rates.

Despite its concession, Kisaan also asserts this Court should "exercise caution" when

reviewing all-other rates based on the expected method where AFA rates are involved.  Kisaan

Br. 13.  But the statute unambiguously does not differentiate between all-others rates based on

zero margins or *de minimis* margins, on the one hand, and AFA-based margins, on the other.

Thus, in *PrimeSource*, the Court rejected the argument that AFA-based rates are punitive and

less representative than *de minimis* or zero rates, holding that "the Federal Circuit has found that

AFA rates may be representative of actual dumping because, 'if it were not so, {mandatory

respondents}, knowing of the rule, would have produced current information showing the margin

to be less." *PrimeSource*, 581 F. Supp. 3d at 1340 n.10 (quoting *Rhone Poulenc, Inc. v. United

States*, 899 F.2d 1185, 1190 (Fed. Cir. 1990)).  "{S}elected respondents are assumed to be

representative of the non-selected respondents without regard to whether their final antidumping

duty margin is zero, *de minimis*, based entirely on the use of AFA, or calculated based on the

questionnaire responses of the selected respondents."  *PrimeSource*, 581 F. Supp. 3d at 1338

(citing *Albemarle*, 821 F.3d at 1353, and *Bosun Tools Co., Ltd. v. United States*, 2021-1930,

2022 WL 94172, at *4 (Fed. Cir. Jan. 10, 2022)).  That is so because "when Commerce relies on

19 U.S.C. § 1677f-1(c)(2) to select the largest exporters by volume for individual examination, it does so based on a statutorily supported assumption that the data from the largest exporters may be viewed as representative of all exporters." *Pro-Team Coil Nail Enter., Inc. v. United States*, No. 18-00027, 2022 WL 2783885, at *4 (Ct. Int'l Trade July 15, 2022) (citing *Albemarle*, 821 F.3d at 1353, and *Changzhou Hawd*, 848 F.3d at 1012).

The Federal Circuit's decision in *Changzhou Wujin Fine Chemical Factory Co. v. United States*, 701 F.3d 1367 (Fed. Cir. 2012), does not diminish the principle that AFA rates are presumed to be representative, contrary to Kisaan's assertions.  Kisaan Br. 13-14.  In that case, Commerce had constructed a hypothetical adverse facts available rate, solely to serve as a basis for an all-others rate.  *See Wujin*, 701 F.3d at 1375-76.  The Federal Circuit specifically distinguished the hypothetical rate from adverse facts available rates assigned to investigated mandatory respondents.  *See id*. at 1378-79 (noting that "{AFA}rates are generally based on verified data, *see* 19 U.S.C. § 1677m(i)(1), and bear a reasonable relationship to the party's actual business practices").  The hypothetical AFA rate present in *Wujin* does not exist in this case.

Kisaan and the Other Plaintiffs also assert that an AFA available rate applied to a mandatory respondent must be commensurate with the "economic reality" of non-examined parties to be used as an all-others rate.  Kisaan Br. 13; Other Pls. Br. 11.  Both rely on this Court's decision in *Navneet Publications (India) Ltd. v. U.S.*, 999 F. Supp. 2d 1354 (Ct. Int'l Trade 2014).  *See* Kisaan Br. 18-19; Other Pls. Br. 18-19.  That decision, however, applied an earlier version of 19 U.S.C. § 1677e.  In 2015, the statute was amended to add subsection (d)(3), stating that Commerce when Commerce uses an adverse inference, is not obligated to consider an interested party's "alleged commercial reality" when applying adverse facts available.

19 U.S.C. § 1677e(d)(3); *see Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283, 1301 (Fed. Cir. 2021) (noting that, pursuant to the statute, Commerce is not required to demonstrate that the dumping margin reflects an alleged commercial reality).  In any event, in *Navneet*, the Court specifically held that Commerce *could* include AFA rates into the calculation of the all-others rate, finding that "the all-others rate statute expressly permits the inclusion of facts available rates" and that "the Federal Circuit has already rejected the argument that AFA rates may not be incorporated into the all-others rate." *Navneet*, 999 F. Supp. 2d at 1359 (citing *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013)).

     *Amanda Foods (Vietnam) Ltd. v. United States*, 647 F. Supp. 2d 1368 (Ct. Int'l Trade 2009), also provides no support for Kisaan's position.  Kisaan Br. 13.  In *Amanda Foods*, the Court held that Commerce had no basis to apply an AFA rate to cooperating uninvestigated respondents, solely because of the presence of non-cooperating uninvestigated respondents, which neither submitted a separate rate application nor filed any other papers.  *Amanda Foods*, 647 F. Supp. 2d at 1381.  That is not this case.  Here, Commerce fully investigated the mandatory respondent, Chandan, and determined that a rate from the investigation under this order was the best available information on the record, Commerce applied this rate to Kisaan and the Other Plaintiffs pursuant to 19 U.S.C §§ 1677e(d)(1)(B) and 1673d(c)(5)(B).  Indeed, the Court in *Navneet*—Kisaan's and the Other Plaintiffs' chosen case—made clear that *Amanda Foods* "never found that Commerce could not lawfully incorporate an AFA rate into its calculations."  *Navneet*, 999 F. Supp. 2d at 1360 n.3.

     Further to its claim that Chandan's rate is not representative, Kisaan also asserts that "there is no clear evidence of overwhelming non-cooperation on the current record to show that an AFA rate could reasonably reflect non-selected respondents that could have cooperated if

given the opportunity." Kisaan Br. 15-16.  Kisaan provides no legal basis for a requirement of "clear evidence of overwhelming non-cooperation.  More to the point, however, if Kisaan wished to demonstrate its cooperation, it should have sought voluntary respondent treatment.  Because this review covered 45 companies, Commerce limited its examination to Chandan, with citation to 19 U.S.C. § 1677f-1(c)(2).  *See* Respondent Selection Memo (C.R. 4) (concluding that individual examination of Chandan would "account for . . . a significant volume of subject merchandise during the POR").  In this circumstance, Kisaan and the other non-selected respondents could have requested voluntary respondent treatment.  *See* 19 U.S.C. § 1677m(a); 19 C.F.R. § 351.204(d).  But Commerce did not receive any comments or requests for voluntary treatment from Kisaan or any of the Other Plaintiffs.  *See* Respondent Selection Memo. (Mar. 13, 2020) (P.R. 26).  Moreover, neither Kisaan nor the Other Plaintiffs met the requirements for voluntary treatment set forth in § 1677m(a), because they did not "submit{} to {Commerce} the information requested from exporters or producers selected for examination" by the deadline established for Chandan as the mandatory respondent.  *See* 19 U.S.C. § 1677m(a).

Kisaan and the Other Plaintiffs, as non-examined respondents, should not be permitted to wait and see whether the all-others rate is too high for their liking before complaining that they did not have the opportunity to be examined.  Indeed, this Court has consistently held that "a party aggrieved by not being selected as a mandatory respondent must request to be reviewed as a voluntary respondent under 19 U.S.C. § 1677m(a) before it can challenge the mandatory respondent selection process in court." *DuPont Teijin Films China Ltd. v. United States*, 7 F. Supp. 3d 1338, 1357 (Ct. Int'l Trade 2014) (citing *Union Steel Mfg. Co. v. United States,* 837 F. Supp. 2d 1307, 1331 (Ct. Int'l Trade 2012), *Amanda Foods (Vietnam) Ltd. v. United States,* 807 F. Supp. 2d 1332, 1348 (Ct. Int'l Trade 2011), *Schaeffler Italia S.r.l. v. United*

*States,* 781 F. Supp. 2d 1358, 1364 (Ct. Int'l Trade 2011), and *Asahi Seiko Co., Ltd. v. United*

*States,* 755 F. Supp. 2d 1316, 1326-27 (Ct. Int'l Trade 2011)).   A plaintiff that fails to seek such

treatment has "failed to exhaust its administrative remedies."   *Amanda Foods*, 807 F. Supp. 2d at

1348.

Having failed to object to the mandatory respondent selection process, Kisaan and the

Other Plaintiffs are not now free to assert that Chandan's dumping margin is unrepresentative.

The CBP data on record demonstrated that the largest exporter by volume, Chandan, "accounted

for a substantial portion of the subject merchandise exports of all exporters and producers for

which Commerce had remaining requests for review."  *See* IDM at 41; *see Qingdao Qihang Tyre*

*Co. v. United States,* 308 F. Supp. 3d 1329, 1363 (Ct. Int'l Trade 2018) (upholding Commerce's

selection of two mandatory respondents that were the two largest and accounted for a substantial

portion of the subject merchandise exports).   Therefore, Commerce had substantial evidence to

conclude that the largest exporter is representative of all exporters and producers for which a

review had been requested.   IDM at 41.[1]

---

[1]  After plaintiffs filed their opening briefs, the Federal Circuit issued a precedential decision in *YC Rubber Co. v. United States,* No. 2021-1489, 2022 WL 3711377 (Fed. Cir. Aug. 29, 2022).  The Federal Circuit held that, when Commerce limits its investigation to fewer than all exporters or producers involved in a review, the "reasonable number" referenced in 19 U.S.C. § 1677f-1(c)(2) "is generally more than one."  *Id.* at *4.  *YC Rubber* does not apply here because, as discussed above, neither Kisaan nor the Other Plaintiffs requested to be voluntary respondents, and so they did not exhaust their administrative remedies.  Although the Federal Circuit in *YC Rubber* noted that no exporter had requested to be a voluntary respondent, *id.* at *2, the court did not address administrative exhaustion or otherwise suggest that the court was altering the established requirement that only non-examined producers that have sought to be voluntary respondents may challenge the respondent selection process.  Moreover, in the Court decision highlighted by the Federal Circuit on the interpretation of 19 U.S.C. § 1677f-1(c), this Court ultimately rejected the plaintiffs' statutory interpretation arguments because plaintiffs' had failed to exhaust administrative remedies.  *Schaeffler Italia S.R.L. v. United States*, 781 F. Supp. 2d 1358, 1365 (Ct. Int'l Trade 2011).

**C.   Commerce Has No Substantial Evidence On The Record To Deviate From The Expected Method**

As noted above, the burden is on the party seeking to depart from the expected method (here, the non-examined respondents) to provide specific evidence that using this method would yield results that would not reasonably reflect the potential dumping margins of the non-selected parties. *See PrimeSource*, 581 F. Supp. 3d at 1338.  Similarly, in *Solianus, Inc. v. United States*, 391 F. Supp. 3d 1331 (Ct. Int'l Trade 2019), the Court held that that plaintiffs were required to allege a specific error in Commerce's application of an AFA-based all-others rate—the Court refused to "take plaintiffs at their word" that an all-others rate did not bear a connection to the actual production experience and sales costs of a cooperating exporter.  *Id.* at 1339.  Underlying this burden is the fact that non-examined parties, not Commerce, are in control of the information necessary to rebut the presumption of the mandatory respondent's representativeness.  *Id.*  The Federal Circuit has recognized this logic, stating that "the burden of production on the {party} which has in its possession the information capable of rebutting the agency's inference."  *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1190-91 (Fed. Cir. 1990).

Here, Kisaan and the Other Plaintiffs offer no specific information to rebut the assumption that Chandan's rate is representative, beyond the mere suggestions that there may be a more representative method and that Kisaan or another respondent *could have* cooperated in this review.  But Commerce is required to follow the expected method unless it has found, based on substantial record evidence, that the non-examined firms' dumping is different.  There is no such record evidence here.

In a variation on its challenge, Kisaan asserts that using a sole adverse facts available rate is not actually an application of the expected method, relying upon *Godaco Seafood Joint Stock*

*Co. v. United States*, 494 F. Supp. 3d 1294 (Ct. Int'l Trade 2021).  In *Godaco*, the Court held that Commerce had not used the expected method, because it "did not weight-average the zero and *de minimis* margins and margins determined pursuant to the facts available, but {rather} applied the 'any reasonable method' approach by using the one rate determined pursuant to AFA."  *Id*. at 1305.  It is clear from 19 U.S.C. § 1673d(c)(5)(B) that the expected method falls within the "any reasonable method" umbrella established by the statute—it is among the potentially-reasonable options.  Commerce may use "other reasonable methods," based on the SAA and pursuant to Federal Circuit precedent, where the expected method is not feasible, or results in an average that would not be reasonably reflective of potential margins for non-examined exporters or producers.  *See Albemarle*, 821 F.3d at 1352 (citing SAA at 873).

In any event and irrespective of whether Commerce's approach might be described as using the expected method or "other reasonable methods," *Godaco* is distinguishable.  In *Godaco* the separate rate respondents identified record evidence of a more reasonable rate from prior periods, and the Court noted that in past proceedings Commerce has determined it reasonable to carry forward rates from prior reviews.  *See Godaco*, 494 F. Supp. 3d at 1306.  Here, however, Commerce expressly considered the possibility of using rates assigned under a previous AD order.  *See* IDM at 43.  But in addition to being calculated under a prior order, the calculated rates were 14 to 20 years old, and "cannot reasonably provide insight into current potential dumping margins."  *Id.*  As the Federal Circuit stated in *Albemarle*, "{t}here is no basis to simply assume that the underlying facts or calculated dumping margins remain the same from period to period," *Albemarle*, 821 F.3d at 1356.  And plaintiffs offer no record evidence suggesting that the prior rates are indicative of present dumping margins.  Moreover, even if the prior order were relevant, the margins calculated thereunder do not demonstrate that the

challenged all-others rate is unreasonable:  As Commerce noted, the International Trade Commission's 2005 sunset review of the previous order shows that Commerce applied margins up to 210.00 percent, including a rate of 162.14 percent for non-examined companies.  IDM at 43.

In sum, substantial evidence supports Commerce's conclusion that there was no evidence on the record to rebut the presumption that the mandatory respondent was representative of non-examined respondents.  Commerce's assignment of  Chandan's rate to non-examined respondents therefore is lawful.

<u>**CONCLUSION**</u>

For these reasons, we respectfully request that the Court deny plaintiffs' motions, sustain Commerce's final results in full, and enter judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/Tara K. Hogan
TARA K. HOGAN
Assistant Director

/s/Geoffrey M. Long
GEOFFREY M. LONG
Senior Trial Counsel
Commercial Litigation Branch
OF COUNSEL:                                         Civil Division
                                                               Department of Justice
ASHLANDE GELIN                             P.O. Box 480
Office of the Chief Counsel                 Ben Franklin Station
   For Trade Enforcement & Compliance   Washington D.C.  20044
Department of Commerce

October 14, 2022                                  Attorneys for Defendant

## **CERTIFICATE OF COMPLIANCE**

I hereby certify pursuant to Chamber Procedure 2(B)(1) that the foregoing brief complies with the Rules of this Court in that it contains 13,529/14,000 words, including text, footnotes, and headings.

/s/Geoffrey M. Long
GEOFFREY M. LONG