Slip Op. No. 23-172

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **KISAAN DIE TECH PRIVATE LIMITED, et al.,** | |
| Plaintiffs, | **Before: Timothy C. Stanceu, Judge** |
| v. | **Consol. Court No. 21-00512** |
| **UNITED STATES,** | |
| Defendant. | |

### OPINION AND ORDER

[Remanding an agency decision concluding an administrative review of an antidumping duty order on stainless steel flanges from India]

Dated:  December 8, 2023

*Duane W. Layton*, Mayer Brown LLP, of Washington, D.C., for plaintiff Kisaan Die Tech Private Limited.

*Peter J. Koenig*, Squire Patton Boggs (US) LLP, of Washington, D.C., for plaintiff Chandan Steel Limited.

*Jeremy W. Dutra*, Squire Patton Boggs (US) LLP, of Washington, D.C., for plaintiffs Echjay Forgings Private Limited, Jai Auto Pvt. Ltd., Goodluck India Limited, Jay Jagdamba Forgings Private Limited, Hilton Metal Forging, Limited, Jay Jagdamba Limited, Jay Jagdamba Profile Private Limited, Shree Jay Jagdamba Flanges Pvt. Ltd., Balkrishna Steel Forge Pvt. Ltd., Pradeep Metals Limited, and Bebitz Flanges Works Private Limited.  With him on the brief was *Peter J. Koenig*.

*Geoffrey M. Long*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant.  With him on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Tara K. Hogan*, Assistant Director.  Of counsel on the brief

was *Ashlande Gelin*, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

Stanceu, Judge: Plaintiffs contest a decision issued by the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") to conclude a review of an antidumping duty ("AD") order on stainless steel flanges from India.  Because Commerce unlawfully chose to examine only one respondent individually and unlawfully assigned an unreasonable rate to the respondents it did not individually examine, the court orders corrective action.

## I. Background

### A. The Contested Determination

Commerce published the contested determination (the "Final Results") as *Stainless Steel Flanges From India: Final Results of Antidumping Duty Administrative Review: 2018–2019*, 86 Fed. Reg. 47,619 (Int'l Trade Admin. Aug. 26, 2021) ("*Final Results*"). Commerce incorporated into the Final Results by reference an explanatory "Issues and Decision Memorandum."  *Stainless Steel Flanges from India: Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review; 2018–2019* (Int'l Trade Admin. Aug. 20, 2021), P.R. 116 ("*Final I&D Mem.*").[1]

---

[1] Documents in the Joint Appendix (May 26, 2022), ECF Nos. 60 (confidential), 61 (public) are cited "P.R. __" (for public documents).  The information disclosed in this Opinion and Order was obtained from the public versions of the record documents.

### B. Prior Administrative Determinations

The review at issue in this case was the first administrative review of an

antidumping duty order (the "Order").  *Stainless Steel Flanges From India: Antidumping*

*Duty Order*, 83 Fed. Reg. 50,639 (Int'l Trade Admin. Oct. 9, 2018) ("*Order*").[2]  Issuance of

the Order followed the Department's final determination of sales at less than fair value,

*Stainless Steel Flanges From India: Final Affirmative Determination of Sales at Less Than Fair*

*Value and Final Affirmative Critical Circumstance Determination*, 83 Fed. Reg. 40,745

(Aug. 16, 2018) ("*Final LTFV Determination*"), and a September 28, 2018 notification to

Commerce by the U.S. International Trade Commission ("ITC") of the ITC's affirmative

determination of injury to the domestic industry, *see Order*, 83 Fed. Reg. at 50,639 &

50,639 n.2.

Commerce initiated the first administrative review in late 2019.  *Initiation of*

*Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 67,712 (Int'l

Trade Admin. Dec. 11, 2019).  It pertained to entries of stainless steel flanges from India

(the "subject merchandise) made during a period of review ("POR") of March 28, 2018

---

[2] The "Scope of the Order" is defined as "certain forged stainless steel flanges, whether unfinished, semi-finished, or finished" that are made of "alloy steel containing, by actual weight, 1.2 percent or less of carbon and 10.5 percent or more of chromium, with or without other elements."  *Stainless Steel Flanges From India: Antidumping Duty Order*, 83 Fed. Reg. 50,639, 50,640 (Int'l Trade Admin. Oct. 9, 2018).  "The scope includes six general types of flanges."  *Id*. (listing "Weld neck," threaded," "slip-on," "lap joint," "socket weld," and "blind" with their general uses).  "Specifically excluded . . . are cast stainless steel flanges."  *Id*.  "The sizes . . . of the flanges within the scope . . . range from one-half inch to twenty-four inches nominal pipe size."  *Id*.

through September 30, 2019.  *Id.*, 84 Fed. Reg. at 67,714; *Final Results*, 86 Fed. Reg.

at 47,619.

Commerce published "Preliminary Results" of the first administrative review in

early 2021.  *Stainless Steel Flanges From India: Preliminary Results of Antidumping Duty*

*Administrative Review; 2018–2019*, 86 Fed. Reg. 11,233 (Int'l Trade Admin. Feb. 24, 2021)

("*Preliminary Results*").

### C.  The Parties

Plaintiff Chandan Steel Limited ("Chandan") was the sole mandatory

respondent, i.e., the only exporter or producer of subject merchandise selected by

Commerce for individual examination in the first administrative review.  *Antidumping*

*Duty Administrative Review of Stainless Steel Flanges from India, 2018–2019: Respondent*

*Selection* at 1 (Int'l Trade Admin. Mar. 13, 2020) ("*Respondent Selection Mem.*").  In the

Final Results, Commerce assigned Chandan a dumping margin of 145.25% *ad valorem*.

*Final Results*, 86 Fed. Reg. at 47,619.

Commerce assigned a 145.25% *ad valorem* rate to the respondents it did not

examine individually in the review, which Commerce based on the rate it assigned to

Chandan.  *Id*.  Twelve of the unexamined respondents are plaintiffs in this consolidated

action.[3]  They are: (1) Kisaan Die Tech Private Limited ("Kisaan"), (2) Echjay Forgings

---

[3] Consolidated under the lead case are Court Nos. 21-00540 and 21-00542.  Order (Nov. 30, 20201), ECF No. 18.

Private Limited, (3) Jai Auto Pvt. Ltd., (4) Goodluck India Limited, (5) Jay Jagdamba

Forgings Private Limited, (6) Hilton Metal Forging, Limited, (7) Jay Jagdamba Limited,

(8) Jay Jagdamba Profile Private Limited, (9) Shree Jay Jagdamba Flanges Pvt. Ltd.,

(10) Balkrishna Steel Forge Pvt. Ltd., (11) Pradeep Metals Limited, and (12) Bebitz

Flanges Works Private Limited.

## II. DISCUSSION

Before the court are plaintiffs' motions for judgment on the agency record,

brought according to USCIT Rule 56.2.  In its motion, Chandan claims that Commerce

misapplied section 776 of the Tariff Act of 1930, *as amended* ("Tariff Act"), 19 U.S.C.

§ 1677e,[4] in assigning it a margin of 145.25% based on the "total" use of "facts otherwise

available" under § 1677e(a) and "adverse inferences" under § 1677e(b).[5]  In their Rule

56.2 motions, all other plaintiffs contest the Department's assigning them the 145.25%

rate as respondents not selected for individual examination.

Before the reasons discussed herein, the court denies Chandan's Rule 56.2 motion

and grants the Rule 56.2 motions of the other plaintiffs.

---

[4] Citations to the United States Code herein are to the 2018 edition.  Citations to
the Code of Federal Regulations are to the 2020 edition.

[5] The term "adverse facts available," or "AFA," is often used when a
determination is made to apply both provisions.

### A. Jurisdiction and Standard of Review

The court exercises jurisdiction under section 201 of the Customs Courts Act of 1980, 28 U.S.C. § 1581(c), pursuant to which the court exercises jurisdiction of actions commenced under section 516A of the Tariff Act, 19 U.S.C. § 1516a, including an action contesting a final determination that concludes an administrative review of an antidumping duty order, *id*. § 1516a(a)(2)(B).

In reviewing a final determination, the court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence refers to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *SKF USA, Inc. v. United States*, 537 F.3d 1373, 1378 (Fed. Cir. 2008) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

### B. Use of "Total Adverse Facts Available" to Determine the Antidumping Duty Margin for Chandan

#### 1. Findings upon which Commerce Based Its Use of "Total AFA"

Commerce based its use of facts otherwise available and adverse inferences on three groups of factual findings.  First, Commerce found that Chandan repeatedly misreported the information on its foreign sales, which information Commerce requires for calculation of a dumping margin. *Final I&D Mem.* at 5–11.  Second, Commerce found that Chandan failed to report, on a control-number ("CONNUM") specific basis,

as Commerce had requested, information on the cost of production of the merchandise in its foreign sales.  *Id*. at 14–19.  Third, Commerce found that Chandan's responses to information requests "contained additional deficiencies relating to its reporting of gross unit price, quantity discounts, other discounts, and duty refunds" that Chandan failed to remedy.  *Id*. at 19–22.

Commerce concluded that the "fundamental reporting deficiencies" affecting Chandan's responses to its questionnaires justified the use of "facts otherwise available" according to 19 U.S.C. § 1677e(a).  *Id*. at 5.  Specifically, Commerce found that Chandan's inadequate responding, even after Commerce allowed an opportunity to explain and to take remedial action, constituted the withholding of requested information as described in 19 U.S.C. § 1677e(a)(2)(A) and the failure to provide information "in the form and manner requested," *id*. § 1677e(a)(2)(B).  *Final I&D Mem.* at 5.  Commerce found, further, that Chandan's misreporting "significantly impeded the proceeding" within the meaning of 19 U.S.C. § 1677e(a)(2)(C).  *Id*. (footnote omitted).  Commerce concluded, further, that the use of an adverse inference, 19 U.S.C. § 1677e(b), was warranted because, it found, Chandan did not act to the best of its ability in responding to the Department's information requests.  *Id*.  As a basis for "total adverse facts available," Commerce found that "the level of inattentiveness and inaccuracy of Chandan's reporting throughout this review undermines the reliability of the company's responses as a whole and, in accordance with section 776(b) of the Act

[19 U.S.C. § 1677e(b)], warrants the application of an adverse inference in selecting from the facts available." *Id.* (footnote omitted). As an adverse inference, and as it did in the Preliminary Results, Commerce assigned Chandan a rate of 145.25%, which was the rate it had assigned in the antidumping duty investigation to a respondent it found to be uncooperative, reasoning that "to create a proper deterrent against future non-cooperation, Commerce continues to find that the application of the highest rate assigned under this order is appropriate." *Id.* at 31.

### 2.  Chandan's Challenge to the Use of "Total Adverse Facts Available"

Chandan challenges the Department's assigning it the 145.25% rate on several grounds. It argues that "[i]t is unlawful for Commerce to use <u>total</u> adverse facts where at best (and erroneously) the record only supports applying <u>partial</u> adverse facts to some U.S. sales." Pl. Chandan's Mot. for J. on the Agency R. 6 (June 30, 2022), ECF No. 37 ("Chandan's Mot."). It maintains, further, that the use of an adverse inference was unlawful because: (1) there was no gap in information that needed to be filled by the use of facts otherwise available, *id.* at 5–25; (2) Commerce unlawfully used adverse facts available without notifying Chandan of deficiencies in the submissions of information to Commerce and allowing Chandan an opportunity to address them, *id.* at 25–27; (3) Chandan acted to the best of its ability in responding to the Department's information requests, and any errors are insufficient for the use of adverse inferences,

*id*. at 27–35; and (4) the adverse inferences Commerce used were unlawfully "punitive,"

*id*. at 35–40.[6]

### 3.  Chandan's Omissions of "Window Period" and Small-Size Sales when Reporting its Comparison Market Sales Database

In calculating a weighted average dumping margin, Commerce ordinarily

compares "U.S. price," which is determined on an export price ("EP") or constructed

export price ("CEP") basis from prices of the exporter's subject merchandise in sales to

the United States, with a group of sales of the "foreign like product," *see* 19 U.S.C.

§ 1677(16), that the exporter made in the "comparison" market.  The "comparison

market" normally is the home market of the exporter, but if the home market is not

"viable," *see* 19 U.S.C. § 1677b(a)(1)(C), Commerce may use the exporter's sales in a

market in a third country, *id*. § 1677b(a)(1)(B)(ii).  *See* 19 C.F.R. §§ 351.404 (selection of

comparison market), 351.414 (comparison of normal value with U.S. price).  In the first

review, Commerce used a third country, the Netherlands, as a comparison market.

Chandan's Mot. 6.

Commerce is directed to identify comparison market sales of the foreign like

product according to criteria set forth in 19 U.S.C. § 1677(16).  Ideally, comparison

market sales will be sales of "merchandise which is identical in physical characteristics

---

[6] In an unrelated claim, Chandan argues that antidumping and countervailing duty cash deposits should not have been deducted from U.S. price.  Pl. Chandan's Mot. for J. on the Agency R. 40–41 (June 30, 2022), ECF No. 37.  The court addresses this claim later in this Opinion and Order.

with, and was produced in the same country by the same person as," the subject

merchandise.  *Id.* § 1677(16)(A).  If Commerce cannot make a determination

satisfactorily on that basis, Commerce may base its comparison on sales of

"[m]erchandise—(i) produced in the same country and by the same person as the

subject merchandise, (ii) like that merchandise in component material or materials and

in the purposes for which used, and (iii) approximately equal in commercial value to

that merchandise."  *Id.* § 1677(16)(B).  If Commerce cannot compare sales on the basis of

this second category, Commerce instead may base its comparison on sales of

"[m]erchandise—(i) produced in the same country and by the same person and of the

same general class or kind as the subject merchandise, (ii) like that merchandise in the

purposes for which used, and (iii) which the administering authority determines may

reasonably be compared with that merchandise."  *Id.* § 1677(16)(C).

Commerce requested in its initial questionnaire (the "March 13, 2020

Questionnaire") that Chandan "report all sales of the foreign like product during the

three months preceding the earliest month of U.S. sales, all months from the earliest to

the latest month of U.S. sales, and the two months after the latest month of U.S. sales."

*Final I&D Mem.* at 5 (quoting *Antidumping Duty Admin. Review: Request for Information*

at B-1 (Int'l Trade Admin. Mar. 13, 2020), P.R. 28–29).[7]  In requiring reporting of

---

[7] Commerce issued several questionnaires during the administrative review, which, as are the responses, are identified herein by dates of issuance and citations to record documents.

comparison market sales that occurred during the five-month "window period,"

including those that may have occurred outside the actual POR, Commerce was

effectuating its "average-to-transaction" method of comparing sales.  *See* 19 C.F.R.

§ 351.414; *Final I&D Mem*. at 8 (". . . in administrative reviews, Commerce normally

compares the export price (EP) or constructed export price (CEP) of an individual U.S.

sale to an average normal value (NV) based on a contemporaneous month in the

comparison market.").  Under this method, the "comparison month" is the same month

as the U.S. sale or, if no matching sales occurred during that month, then the

comparison month is "the most recent of the three months prior to the month of the U.S.

sales in which there was a sale of the foreign like product."  19 C.F.R. § 351.414(f)(2).  "If

there are no sales of the foreign like product during any of these months," the

comparison month will be "the earlier of the two months following the month of the

U.S. sales in which there was a sale of the foreign like product."  *Id*. § 351.414(f)(3).  As

discussed below, Chandan did not submit a comparison market database correctly

during the entire questionnaire process, even though Commerce pointed out Chandan's

errors and allowed the opportunity for correction.

Chandan's response to the March 13, 2020 Questionnaire (the "June 30, 2020

Response") did not include a complete list of the requested sales in the comparison

market.[8]  *See Certain Stainless Steel Flanges from India, Section-B and Section-C response* (June 30, 2020), P.R. 67.  Commerce found that in Exhibit B-2 of that submission, which contained the comparison market sales, "Chandan reported to Commerce only the comparison market sales that it made during the POR itself, *i.e.*, not for the window period."  *Final I&D Mem.* at 5 (footnote omitted).  Chandan does not dispute that its June 30, 2020 Response failed to report the sales outside the POR but gives as a justification for its misreporting that "Chandan has not done a Commerce administrative review for fifteen years" and states, further, that "the concept of window period sales was novel to Chandan."  Chandan's Mot. 11.

Commerce addressed Chandan's misreporting in an "August 19, 2020 Supplemental Questionnaire" and gave Chandan an opportunity to correct its error by allowing it to resubmit its comparison market database to include any window period sales that occurred outside the POR.  *Antidumping Duty Administrative Review of Stainless Steel Flanges from India: Section B and C Supplemental Questionnaire* at 4 ¶ 21 (Int'l Trade Admin. Aug. 19, 2020), P.R. 80.  Chandan's "September 11, 2020 Response" to this

---

[8] "Section A" of the antidumping duty questionnaire ("Organization, Accounting Practices, Markets, and Merchandise") requests general company information. *Antidumping Duty Admin. Review: Request for Information* at A-1 (Int'l Trade Admin. Mar. 13, 2020), P.R. 28–29.  Pertinent to this case, "Section B" of the questionnaire requests information on "Sales in the Home Market or to a Third Country"; "Section C" requests information on "Sales to the United States"; and "Section D" requests information on "Cost of Production and Constructed Value."  *See* Def.'s Resp. to Pl.'s Mots. for J. on the Agency Record 3 (Oct. 14, 2022), ECF No. 52.

questionnaire also was unsatisfactory. *Final I&D Mem*. at 5 & 5 n.27 (citing *Certain Stainless Steel Flanges from India, Section B & C Supplemental Questionnaire Response for question 21* (Sept. 21, 2020), P.R. 91). The Department's "November 25, 2020 Supplemental Questionnaire" concluded that Chandan's reporting of the window period sales occurring outside the POR did not include flanges of nominal pipe size below 1.5 inches and, therefore, failed to include sales of subject flanges that were of a smaller nominal size. *See Antidumping Duty Administrative Review of Stainless Steel Flanges from India: Supplemental Questionnaire* at 1 ¶ 1 (Int'l Trade Admin. Nov. 25, 2020), P.R. 104; *Order*, 83 Fed. Reg. at 50,640 ("The sizes . . . of the flanges within the scope . . . range from one-half inch to twenty-four inches nominal pipe size.").

      Chandan concedes that its September 11, 2020 Response omitted sales of the foreign like product of nominal size less than 1.5 inches. Chandan's Mot. 11 ("Chandan originally reported sales for 1.5 to 24 inch flanges, believing that was what was requested."). In its "December 9, 2020 Response" to the November 25, 2020 Supplemental Questionnaire, Chandan submitted a database to correct for this error, *Certain Stainless Steel Flanges from India, Section B & C Supplemental Questionnaire Responses to questions 1 through 30* at 1 (Dec. 9, 2020), P.R. 111, but Commerce again found a deficiency because "Chandan once again submitted a comparison market database without including sales covering the full five-month window period." *Final I&D Mem*. at 6 (footnote omitted). Chandan objects, to no avail, that Commerce did not

"explicitly" request reporting of window period sales outside the POR in the November 25, 2020 Supplemental Questionnaire.  Chandan's Mot. 11 ("Chandan thus provided the information for the POR, as it had done in the initial response.").  In the earlier, August 19, 2020 Supplemental Questionnaire, Commerce already had placed Chandan on notice that it was necessary that Chandan report window period sales occurring outside the POR.

　　　　As it did before Commerce, Chandan argues before the court that Commerce should have allowed it to correct the error in the December 9, 2020 Response of omitting the window period sales of flanges less than 1.5 inches in nominal size that occurred outside the POR.  Chandan argues that Commerce was placed under an obligation to do so by section 782(d) of the Tariff Act, 19 U.S.C. § 1677m(d), but failed to comply with this statutory directive.  Chandan contends that it "submitted the window period sales as to the 0.5-to-1.5 inch flanges as soon as Commerce first specifically alerted Chandan to the issue in its preliminary decision."  Chandan's Mot. 14 (citing *Claimed Minor Errors In Reporting Comparison Market Sales and Cost Build-Ups—No New Facts Filing* (Mar. 16, 2021), P.R. 120).  Chandan argues that Commerce impermissibly rejected this information as untimely submitted new factual information.  *Id*. (citing *Antidumping Duty Administrative Review of Stainless Steel Flanges from India: Rejection of New Factual Information* (Int'l Trade Admin. Mar. 24, 2021), P.R. 127).

For the Final Results, Commerce rejected the arguments that it should have notified Chandan and should have accepted the corrected database Chandan submitted on March 16, 2021, concluding that "Chandan did not provide a substantial amount of information after multiple explicit requests from Commerce for such information," *Final I&D Mem*. at 10, that certain precedent relied upon by Chandan was inapplicable, *id.* at 10–11, and that "Chandan's interpretation would essentially require that Commerce permit any party to correct deficiencies of any magnitude, at any time during an administrative proceeding—including after Commerce has already issued a preliminary decision," *id*. at 11.

The statutory provision at issue reads as follows:

> If the administering authority . . . determines that a response to a request for information under this subtitle does not comply with the request, the administering authority . . . shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews under this subtitle.  If that person submits further information in response to such deficiency and either—(1) the administering authority . . . finds that such response is not satisfactory, or (2) such response is not submitted within the applicable time limits, then the administering authority . . . may, subject to subsection (e), disregard all or part of the original and subsequent responses.

19 U.S.C. § 1677m(d).  Chandan argues that accepting the March 16, 2021 database would not have been impracticable in that the Final Results were published on August 26, 2021.  Chandan's Mot. 14.

The court concludes that Commerce did not act contrary to 19 U.S.C. § 1677m(d) in declining to accept the revised home market database Chandan submitted on March 16, 2021. Commerce first requested that database a year earlier (on March 13, 2020). By the time Chandan made its March 16, 2021 submission, Chandan had submitted that database three times before: on June 30, 2020, when it incorrectly omitted the window period sales outside of the POR, on September 11, 2020, when Chandan responded to the Department's notifying it of that error by adding such sales but then erroneously omitted sales of the foreign like product of nominal size less than 1.5 inches, and on December 9, 2020, when it again omitted window period sales outside the POR when correcting for that error. In all three instances, Chandan failed to follow the Department's instructions for reporting the same requested information, despite the Department's identifying the errors and allowing for correction. Chandan's fourth submission of information to complete the comparison market sales database on March 16, 2021 occurred nearly eleven months after the initial due date for the original submission. By that time, Commerce already had issued the Preliminary Results (on February 24, 2021). Commerce identified the error in the December 9, 2020 submission in issuing the Preliminary Results, but this was the second time Chandan committed the same reporting error, i.e., omission of window period sales outside the POR, even after Commerce brought that error to Chandan's attention in the August 19, 2020 Supplemental Questionnaire.

As 19 U.S.C. § 1677m(d) requires, Commerce not only identified the "window

period" reporting error but allowed Chandan the opportunity to correct it.  Similarly,

Commerce allowed Chandan to correct its failure to report the sales in the smaller sizes

that were within the scope of the Order.  The Tariff Act does not require Commerce to

allow two opportunities to correct the same error.  By the time Chandan attempted to

correct, again, its non-POR window period misreporting error, the Preliminary Results

had been issued (again notifying Chandan of the window-period reporting error), and

the submission of information necessary to correct that error was no longer within the

due date for submission of information in response to the November 25, 2020

Supplemental Questionnaire.  *See* 19 U.S.C. § 1677m(d) (allowing rejection of a response

"not submitted within the applicable time limits"); 19 C.F.R. § 351.301.  As explained in

the Statement of Administrative Action ("SAA") accompanying the Uruguay Round

Agreements Act:

> New section 782(d) requires Commerce and the Commission to
> notify a party submitting deficient information of the deficiency, and to
> give the submitter an opportunity to remedy or explain the deficiency.
> *This requirement is not intended* to override the time-limits for completing
> investigations or reviews, nor to allow parties *to submit continual
> clarifications or corrections of information* or to submit information that
> cannot be evaluated adequately within the applicable deadlines.  If
> subsequent submissions remain deficient *or are not submitted on a timely
> basis*, Commerce and the Commission may decline to consider all or part
> of the original and subsequent submissions.

H.R. Rep. No. 103–316, at 865 (1994) ("*SAA*") (emphasis added).  Based on the record

information considered on the whole, Commerce acted within its statutory and

regulatory discretion in refusing to accept the March 16, 2021 submission.  In arguing to

the contrary, Chandan maintains that accepting the March 16, 2021 database was

required by "[e]xtensive court precedent."  Chandan's Mot. 14 & 14 n.30 (citing two

precedential decisions, *Timken Corp. v. United States*, 434 F.3d 1345, 1353 (Fed. Cir. 2006)

and *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1207–09 (Fed. Cir. 1995)).  Neither

case is on point.  *Timken Corp*. and *NTN Bearing Corp*. did not involve the use of facts

otherwise available or adverse inferences.  Both involved situations in which a

respondent brought an error to the Department's attention.

       Chandan's argument that there was no gap in information requiring use of facts

otherwise available, Chandan's Mot. 5–25, is also unavailing.  Commerce did not

receive a complete and reliable comparison market sales database during the

questionnaire period and, for the reasons the court has pointed out, permissibly refused

to accept the fourth iteration of the comparison market database.  Nor is Chandan

correct in asserting that Commerce unlawfully used adverse facts available without

notifying Chandan of deficiencies in the submissions of information to Commerce and

allowing Chandan an opportunity to address them.  *Id.* at 25–27.  Commerce accepted

Chandan's September 11 and December 9, 2020 resubmissions of the comparison

market database, which responded to reporting errors Commerce identified.

       The court also finds unpersuasive Chandan's arguments that Chandan acted to

the best of its ability in responding to the Department's information requests and that

any errors are insufficient for adverse inferences.  *Id*. at 27–35.  The record reveals that

Commerce permissibly found repeated misreporting of the comparison market sales

database, refuting any notion that Chandan acted to the best of its ability.  Chandan

highlights the circumstances that it "is a small company, with limited professional staff,

limited as to understanding all aspects of a complex and hugely demanding U.S.

antidumping duty law, and not fully proficient in English (not the native language of

the staff)."  *Id*. at 29 (footnote omitted).  It argues, moreover, that Commerce did not

allow it sufficient time to respond to requests for information, allowing only 19 total

days of extension out of a total of 31 days requested, and in doing so failed to recognize

the difficulties caused by the Covid emergency.  *Id*. at 29–32.  These arguments do not

convince the court that Commerce was statutorily barred from invoking an adverse

inference.  Commerce gave Chandan two opportunities to resubmit the comparison

market database, without any adverse action, over the course of the time period from

the March 13, 2020 date of the initial questionnaire to the December 9, 2020 date of

Chandan's second resubmission.  That second resubmission still was unsatisfactory

because Chandan, for the second time, failed to include sales outside the POR as

directed by Commerce.

Chandan argues that any errors in the comparison market database were too

minor or insufficient for adverse inferences and did not prevent Commerce from using

the database with certain allowances or adjustments, *id*. at 8–10, but this argument also

is misguided.  Commerce must be able to obtain from cooperative respondents, on a

timely basis, a reliable comparison market database in order to calculate a weighted

average dumping margin.  As of the time it issued the Preliminary Results, it still lacked

reporting of sales of Chandan's smaller-sized flanges that occurred outside the POR,

which sales were unavailable for comparison with U.S. sales.  The implied premise of

Chandan's argument is that Commerce was obligated to examine, rather than reject, the

reporting of additional information that Chandan later submitted, on March 16, 2021,

and use it to calculate a dumping margin.  As the court has explained, the statute and

regulations allowed the rejection of this information and its exclusion from the record.

Thus, Commerce was under no obligation to use this information or to review it to

determine the degree to which the omission of the information from the database

submitted earlier would have affected adversely the calculation of a dumping margin.

### 4.  Chandan's Reporting of the Costs of Production of the Foreign Like Product and Other Reporting Issues Identified by Commerce

Commerce requested data on Chandan's U.S. sales and comparison market sales

that were organized according to "CONNUM" (or "control number"), which it defined

as "an identifier for a product, or a group of products, with a unique and

specifically-defined set of physical characteristics."  *Decision Mem. for Prelim. Results of*

*the Antidumping Duty Admin. Review: Stainless Steel Flanges from India; 2018–2019*

at 7 n.36 (Int'l Trade Admin. Feb. 17, 2021), P.R. 116 ("*Prelim I&D Mem.*").  Commerce

concluded that Chandan did not report correctly its production costs for the foreign like

product "at the CONNUM-specific level," as Commerce had requested.  *Final I&D*

*Mem.* at 14.  Commerce concluded, further, that this misreporting prevented Commerce

from making correctly several determinations it is required to make, including:

(1) determining which comparison market sales may have been made at less than the

cost of production and therefore deleted from the comparison market data base

pursuant to 19 U.S.C. § 1677b(b)(1); (2) identifying sales of "similar merchandise" for

comparison to U.S. sales of subject merchandise; (3) making "difference in

merchandise" adjustments pursuant to 19 U.S.C. § 1677b(a)(6)(C); and (4) calculating

"constructed value" pursuant to 19 U.S.C. § 1677b(e).  *Id.*  Commerce concluded that

"Chandan's cost reporting failures have key implications for our margin analysis," *id.*

at 15, and "support the application of AFA," *id.* at 14.

Commerce found (and Chandan does not contest) that "Chandan does not

maintain product-specific costs in its normal books and records, and, therefore, it used

an allocation methodology to determine the per-unit costs for each reported

CONNUM" and that "[t]hese allocations are heavily reliant on weight."  *Id.* at 19.  The

parties disagree on whether the allocation method adopted by Chandan produced

accurate and reliable cost build-ups for each CONNUM.  Based on what it considered to

be discrepancies and inconsistencies in the reported information, Commerce found that

"Chandan's reported per-unit cost data are inaccurate and unreliable," *id.* at 15,

a finding Chandan contests before the court, Chandan's Mot. 15 ("Chandan accurately

reported production cost."). Chandan asserts that the Department's claims of

misreporting "at best, are the result of Commerce's unlawful failure to notify Chandan

of any concerns and provide an opportunity to address." *Id.*

As to the other reporting issues Commerce raised, Chandan submits that

"Commerce's alleged deficiencies in Chandan's reported gross unit price, quantity

discounts, other discounts, and duty refunds are minor, remediable from the record,

and do not individually warrant facts available." Pl. Chandan Reply Br. 13 (Jan. 17,

2023), ECF No. 59 (citing Chandan's Mot. 24–25, 40–41). According to Chandan, "[t]he

quantity discounts were reported accurately even though they were not reported in the

exact form requested by Commerce in its supplemental questionnaire" and that, in any

event, that "[t]he reported quantity discount is insignificant—i.e., 0.18% of total sales

value to the United States." Chandan's Mot. 24 (footnote omitted). It argues, further,

that information on gross unit prices of comparison market sales was on the record and

available to calculate normal value. *Id.* at 24–25.

The court need not resolve the disagreements between the parties that arise from

Chandan's allocation method for the reporting of the costs of production and from

reporting of gross unit price, quantity discounts, other discounts, and duty refunds.

Even if the reporting errors claimed by Commerce to have occurred in these categories

were nonexistent, minor, or inconsequential (as Chandan argues they were), the court is

not able to presume that the omission of sales of smaller-size flanges occurring in

window periods outside of the POR could be so described.  The information necessary to show the effect of the failure to report the sales of the smaller-size flanges that occurred outside the POR is not on the record, Commerce permissibly having excluded it.  As the court concluded previously, that omission left Commerce without a reliable comparison market sales database as of the time it issued the Preliminary Results. A reliable comparison market sales database for matching with a U.S. sales database is fundamental and essential for the Department's ability to calculate a weighted average dumping margin.  Therefore, this omission justified the use of facts otherwise available as a total substitute for that database and, accordingly, for the assignment of a dumping margin.  Because Commerce lacked a complete database even after allowing Chandan opportunities to correct its reporting errors, Commerce also acted within its discretion in using an adverse inference when selecting from among those facts otherwise available.

### 5.  Selection of an Adverse Inference Rate

Chandan argues that the 145.25% rate Commerce chose as an adverse inference was unlawfully "punitive."  Chandan's Mot. 35–40.  The court disagrees.

The immediate source of the 145.25% rate was the antidumping duty investigation, in which Commerce assigned this rate as an adverse inference "to an

uncooperative respondent, the Bebitz/Viraj single entity."[9]  *Final I&D Mem.* at 32.  The

rate assigned to that entity was derived from the antidumping duty petition: Commerce

explained that "in the *Preliminary Results*, Commerce selected the highest rate alleged in

the petition, because it is higher than the only rate calculated in the investigation."  *Id.*

at 33.  Commerce did not depart from this reasoning for the Final Results.  *Id.*

    The Tariff Act provides that an adverse inference "may include reliance on

information derived from . . . the petition," 19 U.S.C. § 1677e(b)(2), as Commerce has

done here.  It further provides that Commerce, in selecting among the facts otherwise

available, may . . . use any dumping margin from any segment of the proceeding under

the applicable antidumping order."  *Id.* § 1677e(d)(1)(B).  In choosing one of those

dumping margins, Commerce "may apply any of the . . . dumping margins specified

under that paragraph [i.e., paragraph (1) of § 1677e(d)], *including the highest such rate or*

*margin*, based on the evaluation by the administering authority of the *situation* that

resulted in the administering authority using an adverse inference in selecting among

the facts otherwise available."  *Id.* § 1677e(d)(2) (emphasis added).

---

[9] Commerce assigned this rate as the dumping margin to the Bebitz/Virage entity and also to the "Echjay single entity."  *Stainless Steel Flanges From India: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Critical Circumstance Determination*, 83 Fed. Reg. 40,745, 40746 (Int'l Trade Admin. Aug. 16, 2018).  The only other dumping margin Commerce calculated in the investigation was a 19.16% margin assigned to Chandan Steel Limited.  *Id.*

As outlined above, Commerce found itself in a "situation" in which a mandatory

respondent twice (on September 11 and December 9, 2020) resubmitted its comparison

market database in response to errors identified by Commerce without doing so in a

way that would have allowed Commerce to use that database to calculate a correct

dumping margin.  Chandan failed to provide Commerce a database that complied fully

with reporting instructions even though Commerce allowed resubmissions to correct

the failure to report window period sales outside of the POR and the failure to report

sales of small-size flanges after bringing those errors to Chandan's attention.  In such a

situation, Commerce must have discretion to choose a rate sufficiently adverse to create

the incentive for the careful and timely responses to requests for information that are

needed for the calculation of a weighted average dumping margin.

**6.  Deduction of Antidumping and Countervailing Duty Cash Deposits from U.S. Price**

Chandan claims that it "inadvertently included AD/CVD [antidumping duty and

countervailing duty] cash deposits" when reporting customs duties in a questionnaire

field and, therefore, that "Commerce should remove those cash deposits" to ensure that

these cash deposits are not deducted from U.S. price in the calculation of a dumping

margin.  Chandan's Mot. 40.  The court interprets this claim as pertinent to the

calculation of U.S. price, and therefore pertinent to the calculation of a weighted

average dumping margin based on Chandan's sales pertaining to the POR, should the

court direct Commerce to do so in its remand order.

As discussed above, Chandan has not demonstrated its right to a remand order that would set aside the Department's decision to assign it the 145.25% rate, which is based on an adverse inference rather than an examination of Chandan's sales. Therefore, the court concludes that no relief can be granted on Chandan's claim relating to deposits of antidumping and countervailing duties.

C. **Assignment of the 145.25% Rate to the "Companies Not Individually Examined"**

For the reasons stated below, the court sets aside as unlawful the Department's assigning the 145.25% rate to respondents not individually examined in the first administrative review.

1. **Assignment of the 145.25% Rate to the Companies Not Individually Examined Violated the Rule of** *YC Rubber*

The Court of Appeals for the Federal Circuit ("Court of Appeals") issued *YC Rubber Co. (North America) LLC v. United States*, No. 21-1489, 2022 WL 3711377 (Fed. Cir. Aug. 29, 2022) ("*YC Rubber*") one year after the publication of the Final Results. The precedent established by *YC Rubber* requires the court to invalidate the Department's assignment of the 145.25% rate to the respondents Commerce did not examine individually in the first administrative review.

Like this case, *YC Rubber* arose from a challenge to the results of an administrative review of an antidumping duty order and, like this case, involved the selection of an "all others" rate based on the individual examination of one respondent. Specifically, after examining individually "only a single mandatory respondent" in the

review at issue in *YC Rubber*, Commerce assigned the weighted average dumping

margin it determined for this respondent, which was 64.57%, to "all participants in the

review." *Id*. at *2.

In *YC Rubber*, the Court of Appeals interpreted section 777A(c)(2) of the Tariff

Act, 19 U.S.C. § 1677f-1(c)(2), which provides that "[i]f it is not practicable to make

individual weighed average dumping margin determinations . . . because of the large

number of exporters or producers involved in the investigation or review, the

administering authority may determine the weighted average dumping margins for *a*

*reasonable number* of exporters or producers." The Court of Appeals held that

Commerce fails to comply with this provision when it bases its rate for unexamined

respondents on the individual examination of only one exporter or producer: "We

conclude that a 'reasonable number' is generally more than one." *Id*. at *4. The

appellate court declined to accord the Department's interpretation of § 1677f-1(c)(2)

deference under *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984),

noting that the provision at issue is an exception to a general rule: "The statute calls for

all respondents to be individually investigated, unless the large number makes separate

review impracticable." *Id*. at *3. Addressing the government's argument that

"Commerce's position that it suffices to review only one respondent warrants *Chevron*

deference," the Court of Appeals concluded "that Commerce's interpretation is contrary

to the statute's unambiguous language." *Id*.

*YC Rubber* is directly on point.  In the review at issue here, Commerce decided to examine individually only Chandan, finding that "an individual examination of the largest exporter and producer will account for a significant volume of subject merchandise during the POR."  *Respondent Selection Mem.* at 4.  Commerce further decided, over the objections of some respondents, *see Final I&D Mem.* at 33–36, that it permissibly could use the margin it determined for Chandan as the rate to be applied to the reviewed but unexamined respondents.  Under the binding precedent of *YC Rubber*, both decisions were unlawful, and, therefore, the resulting assignment of the 145.25% rate to the unexamined respondents must be invalidated.

Defendant argues that the holding in *YC Rubber* does not apply in this litigation because "neither Kisaan nor the Other Plaintiffs requested to be voluntary respondents, and so they did not exhaust their administrative remedies."  Def.'s Resp. to Pls.' Mots. for J. on the Admin. R. 42 n.1 (Oct. 14, 2022), ECF No. 52.  Defendant submits that:

> Although the Federal Circuit in *YC Rubber* noted that no exporter had requested to be a voluntary respondent, . . . the court did not address administrative exhaustion or otherwise suggest that the court was altering the established requirement that only non-examined producers that have sought to be voluntary respondents may challenge the respondent selection process."

*Id.* (citing *YC Rubber*, 2022 WL 3711377, at *2).  Defendant's argument misconstrues the claims the plaintiffs other than Chandan are raising.  They are challenging the Department's assigning them the 145.25% rate as a rate for respondents not individually examined (i.e., an "all-others" rate).  They are not challenging their non-selection as

respondents for which Commerce would conduct an individual examination of their

respective sales.

This Court rejected a similar "failure to exhaust" argument in *Siemens Gamesa*

*Renewable Energy v. United States*, 47 CIT __, __, 621 F. Supp. 3d 1337, 1348 (2023)

("*Siemens Gamesa*").  The plaintiff in that case, Siemens Gamesa, had been assigned a

73.00% rate as an all-others rate based on an investigation of a single respondent; in its

opinion, the Court concluded that:

> Siemens Gamesa was under no obligation to request to be a
> voluntary respondent (or, for that matter, to be a substitute mandatory
> respondent) in order to exhaust administrative remedies and thereby
> preserve its right to contest the Department's assigning it the 73.00% rate
> as an all-others rate, as any respondent adversely affected by that rate
> potentially could have done.

*Id*.  Here, as in *Siemens Gamesa*, the all-others rate was a consequence of the

Department's conducting the proceeding in violation of 19 U.S.C. § 1677f-1(c)(2).  It also

is pertinent to the issue of exhaustion of administrative remedies that *YC Rubber* was

decided after the issuance of the Final Results.  As *Siemens Gamesa* stated, "[c]ourts have

long recognized 'intervening legal authority' as an exception to the exhaustion

requirement."  47 CIT at __, 621 F. Supp. 3d at 1348 (citation omitted).

### 2. Assigning the 145.25% Rate to the "Companies Not Individually Examined" Violated the "Reasonable Method" Requirement

In addition to violating the rule of *YC Rubber*, the Department's decision to assign the 145.25% rate to the unexamined respondents was unlawful because it did not comport with the "reasonable method" requirement imposed by the Tariff Act.

Congress addressed the method of determining an "all-others" rate in an antidumping duty investigation in section 735(c)(5) of the Tariff Act, 19 U.S.C. § 1673d(c)(5). Although this provision "applies on its face only to investigations, not periodic administrative reviews, . . . the statutory framework contemplates that Commerce will employ the same methods for calculating a separate rate in periodic administrative reviews as it does in initial investigations." *Albemarle Corp. v. United States*, 821 F.3d 1345, 1352 (Fed. Cir. 2016) ("*Albemarle*") (footnote and internal citations omitted).

The Tariff Act applies a "general rule" under which "the estimated all-others rate shall be an amount equal to the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and de minimis margins, and any margins determined entirely under section 1677e of this title." 19 U.S.C. § 1673d(c)(5)(A). Because Commerce determined only one margin in the review, and because that margin was "determined entirely under section 1677e," Commerce was not in a position to apply the "weighted

average" method of the "general rule."  In § 1673d(c)(5)(B), Congress provided an

"exception" to the "general rule," as follows:

> If the estimated weighted average dumping margins established for
> all exporters and producers individually investigated are zero or de
> minimis margins, or are determined entirely under section 1677e of this
> title, the administering authority may use any reasonable method to
> establish the estimated all-others rate for exporters and producers not
> individually investigated, including averaging the estimated weighted
> average dumping margins determined for the exporters and producers
> individually investigated.

*Id*. § 1673d(c)(5)(B).  In *Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d

1370 (Fed. Cir. 2013) ("*Bestpak*"), the Court of Appeals resolved an interpretive question

raised by § 1673d(c)(5)(B).  Under the holding in *Bestpak*, the specific mention of the

"averaging" method in the provision does not signify congressional intent that resort to

this method is *per se* reasonable.  Instead, *any* rate Commerce would apply to

respondents that it does not investigate or review individually must satisfy the

"reasonable method" test.

In the antidumping duty investigation culminating in *Bestpak*, Commerce

calculated an all-others rate by taking a simple average of a 247.65% "AFA China-wide

rate," which Commerce assigned to one of the two mandatory respondents based

entirely on 19 U.S.C. § 1677e for failure to cooperate in the investigation, with a

de minimis margin assigned to the other, cooperating mandatory respondent, resulting

in a 123.83% "all-others" rate that Commerce applied to respondents that were not

individually investigated.  *Id*., 716 F.3d at 1375.  The Court of Appeals explained that

"[a]lthough Commerce may be permitted to use a simple average methodology to

calculate the separate rate [which Commerce applied to respondents that demonstrated

independence from the Chinese government but were not individually investigated],

the circumstances of this case renders a simple average of a *de minimis* and AFA

China-wide rate unreasonable as applied." *Id*., 716 F. 3d at 1378.  The Court concluded

that "a review of the administrative record reveals a lack of substantial evidence

showing that such a determination reflects economic reality." *Id*.  The Court further

observed that "[t]his case is peculiar in that Commerce identified only two significant

exporters/producers, yet one was assigned a *de minimis* dumping margin while the

other was assigned the highest possible AFA China-wide margin." *Id.*, 716 F.3d at 1380.

"The result is not only limited and frustrating, as the Court of International Trade

described it, but is also unreasonable." *Id*.

In the administrative review at issue in this case, Commerce cited what it termed

the "expected method" of § 1673d(c)(5)(B) as identified in *Albemarle* in applying the

145.25% rate to the unexamined respondents.  Commerce recounted that "[i]n the

*Preliminary Results*, we applied Chandan's dumping margin to the companies subject to

this review that were not individually examined, consistent with the expected method

under section 735(c)(5)(B) of the Act," *Final I&D Mem.* at 33, and then concluded that

"application of the expected method is reasonable here because the record evidence

does not rebut the presumption that margin [*sic*] for the mandatory respondent is

representative," *id*. at 38.  Commerce referred to the averaging method of

§ 1673d(c)(5)(B) as the "expected method" based on language in *Albemarle*, 821 F.3d

at 1352 & 1352 n.5 (quoting *SAA* at 873).

Nothing in the SAA supports the Department's imposing a rebuttable

"presumption" that the 145.25% rate, which was based entirely on AFA, was

representative of a margin that would be reasonable if applied to every unexamined

respondent in the review, i.e., every respondent other than Chandan.  The relevant text

of the SAA (quoted in *Albemarle*, 821 F.3d at 1352 n.5), is as follows:

> Section 219(b) of the bill adds new section 735(c)(5)(B) which
> provides an exception to the general rule if the dumping margins for all of
> the exporters and producers that are individually investigated are
> determined entirely on the basis of the facts available or are zero or *de
> minimis*.  In such situations, Commerce may use any reasonable method to
> calculate the all others rate.  The expected method in such cases will be to
> weight-average the zero and *de minimis* margins and margins determined
> pursuant to the facts available, provided that volume data is available.
> However, if this method is not feasible, or if it results in an average that
> would not be reasonably reflective of potential dumping margins for non-
> investigated exporters or producers, Commerce may use other reasonable
> methods.

*SAA* at 873.  An obvious flaw in the Department's analysis is that Commerce did not

actually apply the "expected method" described in the SAA.  Commerce did not

"weight average," let alone average, anything in determining its all-others rate.

"Averaging" necessarily involves the situations of different exporters and thus rests on

a wider data base than does use of only one margin.  But the Department's selection of

only one respondent for individual examination (which itself was unlawful, as

discussed above) left it with only one margin, and thus no averaging of any kind was possible. That deficiency aside, the application of the 145.25% rate to the unexamined respondents, in additional respects, was unreasonable and unsupported by substantial record evidence.

Commerce offered, in essence, only one evidence-based rationale for its conclusion that assigning the 145.25% rate to the unexamined respondents was "reasonable": that this was the rate assigned to the exporter, Chandan, that "accounted for a substantial portion of the subject merchandise exports of all exporters and producers for which Commerce had remaining requests for review." *Final I&D Mem*. at 41 (quoting *Qingdao Qihang Tyre Co. v. United States*, 42 CIT __, __, 308 F. Supp. 3d 1329, 1363 (2018)). This rationale is specious. Chandan's failure to act to the best of its ability in responding to information requests in the review, which was the sole basis upon which Commerce applied "total adverse facts available" to Chandan, had no factual relationship to the unexamined respondents' sales of subject merchandise that pertained to the first administrative review. These were sales that Commerce, of its own volition, refused to examine. The rate from which the 145.25% rate was taken, which was assigned to an uncooperative respondent in the investigation and also was based on total AFA, similarly lacked a relationship to those sales. In that respect, the Department's use of the 145.25% rate as an "all-others" rate was even less

representative of respondents not individually examined than was the rate held

unlawful in *Bestpak*.

Nor can support for the Department's assigning the 145.25% rate to the

unexamined respondents be found in the decision of the Court of Appeals in *Albemarle*,

which involved facts and circumstances highly dissimilar to those of the review at issue

in this case.  *Albemarle* arose from the third periodic administrative review of an

antidumping duty order on activated carbon from China, following which Commerce

published final results assigning zero margins to the two mandatory respondents.

*Albemarle*, 821 F.3d at 1349.  But rather than follow the "expected method" of 19 U.S.C.

§ 1673d(c)(5)(B) by averaging these two calculated margins to yield zero margins for the

three separate rate respondents in the review that were not examined individually,

Commerce assigned each of these three respondents the specific-tariff antidumping

duty margins it had determined for them in the previous, second review of the

antidumping duty order.  *Id*.  For one of those three, a mandatory respondent in the

second review, Commerce carried over the individually-calculated $0.44/kg. margin

from that review; the other two separate rate respondents received in the third review

the $0.28/kg. margin they were assigned in the second review, which Commerce had

obtained by averaging the individually-determined margins of two mandatory

respondents in that review.  *Id*.  The Court of Appeals disallowed the Department's

decision to carry over the margins from the previous review, holding that Commerce

instead should have followed the "expected method," under which Commerce would have averaged the two zero margins to obtain zero margins for the three respondents that Commerce did not examine individually in the third review.  The Court reasoned that Commerce has no "mandate to routinely exclude zero or de minimis margins" and that "Commerce's insistence on using its hostility to de minimis rates as the driving force behind its methodology is on its face arbitrary and capricious."[10]  *Id.*, 821 F.3d at 1354.

### III.  Conclusion and Order

For the reasons set forth in the foregoing, the court sustains the Department's assigning the rate of 145.25% to Chandan and sets aside as unlawful the assignment of that rate to the other plaintiffs in this case.

Therefore, upon consideration of plaintiffs' Rule 56.2 motions and all papers and proceedings had herein, and upon due diligence, it is hereby

**ORDERED** that Chandan's motion for judgment on the agency record be, and hereby is, denied; it is further

**ORDERED** that the motions for judgment on the agency record of the other plaintiffs in this case be, and hereby are, granted; it is further

**ORDERED** that defendant shall consult with counsel for plaintiffs other than Chandan and submit to the court, by January 22, 2024, an agreed-upon proposed schedule for the conducting of proceedings that will conclude the litigation before the court; and it is further

---

[10] A zero or "de minimis" rate, unlike a rate based entirely on facts otherwise available with an adverse inference, is a margin calculated from the individual examination of a respondent's sales.

**ORDERED** that if defendant and the plaintiffs other than Chandan are unable to reach agreement on the above-referenced proposed schedule, these parties shall submit, by January 22, 2024, a joint status report on their negotiations.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Judge

Dated:  December 8, 2023
           New York, New York